In the Matter of the Estate of JULIA SIMPSON, Deceased.

Surrogate's Court, New York County, January 16, 1941.

*Hardy, Stancliffe & Hardy* [*John L. Farrell* and *William F. McDermott* of counsel], for the petitioner.

*David M. Neuberger*, for the contestant.

*E. Talbot Nolan*, for Frieda Rogers, as administratrix, etc., of Augusta Grossman, deceased legatee.

*Louis A. Charnow*, special guardian.

FOLEY, S. In this contested probate proceeding the proponent moves for the dismissal and the striking out of the objections of the contestant, Josephine C. Sutton, and the notice of appearance filed on her behalf by her attorney. The application is based upon the contention that the contestant was not related to the testatrix, was not one of her next of kin and, therefore, lacks a legal status to contest the will. A hearing was ordered by the surrogate for the submission of proof by the contending parties as to the kinship of the contestant. Oral and documentary evidence has been taken upon the issues.

The husband of the testatrix had predeceased her. Their two children had likewise died before her without leaving issue. In the petition for probate and in a supporting affidavit, the contestant was described, upon information supplied by her, as one of the next of kin and a first cousin of the testatrix. It was contended upon the trial of status, however, that she was of nearer relationship and was actually a niece, as the daughter of a deceased sister of the testatrix. This altered claim was clearly an afterthought on the part of the contestant. As a first cousin she would share the estate in intestacy with at least nine other first cousins. If she could establish her lawful status as niece, she would be the sole next of kin.

The questions now presented for determination are:

(1) Was the contestant's mother, now deceased, the legitimate or illegitimate daughter of the mother of the testatrix?

(2) If the contestant's mother was illegitimate, is the contestant, under our statute of distribution, a next of kin of the testatrix?

The surrogate holds upon the evidence that the mother of the contestant was born out of lawful wedlock. The documentary evidence in the case is extremely impressive in support of that conclusion.

It has been urged by counsel for the contestant that the presumption of legitimacy should be invoked and applied in favor of the deceased mother of the contestant so as to sustain the status of the contestant as a niece of the testatrix. While that presumption is one of the strongest known to the law, nevertheless, like other presumptions, it is subject to be rebutted by the evidence in the case. In *Matter of Findlay* (253 N. Y. 1), Chief Judge CARDOZO, with his distinctive vigor, restated the rules relating to the presumption. He wrote that countervailing evidence may overcome and shatter the presumption. " Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities. * * * They will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty." He quoted from *Nolting* v. *Holt* (113 Kan. 495; 215 P. 281): " When all the ends which the presumption of legitimacy is designed to conserve have been defeated by sordid facts, the courts must deal with the situation in a common-sense way."

The question is thus presented whether the proofs before the surrogate justify the presumption of legitimacy or rebut it. The male ancestor of the testatrix and of the contestant emigrated from Europe over a century ago. His original name was " Septant." For business purposes the ancestor shortly after he came to America adopted the name " Sutton." Josephine Marie Sutton was the mother of the testatrix by her ceremonial marriage to Julius T. Wolff. They were married on May 22, 1852. Some seven years before that marriage and on September 8, 1845, a daughter was born to Josephine, who was named Elizabeth. Elizabeth was the mother of the contestant. It is the status of Elizabeth, as legitimate or illegitimate, which is the subject of dispute here. It is claimed by the contestant that the father of Elizabeth was one Thomas Duncan. No record of any ceremonial marriage between Duncan and Josephine Sutton has been found, nor is there the slightest proof of a common-law marriage. In fact, the testimony of the contestant, herself, forever destroys the inference of the latter form of marriage by her statement that Josephine and Duncan never lived together as man and wife. Josephine, the alleged wife, never used the name Duncan and in so far as the documentary proof is concerned continued to be known as Josephine Sutton up to the time of her marriage to Wolff in 1852. The baptismal record of Elizabeth, the daughter of Josephine whose legitimacy is in dispute, is particularly significant. She was baptized in a church in Buffalo, N. Y. The name of her mother was given in the baptismal record as " Josephine Sutton Septant." The latter name was, as previously stated, her father's original

name before the change to " Sutton." The name of the father of the child, Elizabeth, is significantly omitted from the baptismal record. This document was offered in evidence by the contestant, despite the inferences unfavorable to her, which necessarily follow from it. With the usual care given to entries in a baptismal record, the omission to mention the father of the child is strong indication that the mother of the child was not married and that the child was not legitimate.

When Josephine, the mother of Elizabeth, subsequently married in 1852 Julius T. Wolff, the father of the testatrix, she was known by her maiden name — Sutton. That fact is clearly revealed by a book entitled " Family Record," which was written by the testatrix and her son. It contains an interesting genealogical history of the family of the testatrix. It was also offered in evidence by the contestant. No reference is made by the testatrix or by her son in that book to the fact that her mother, Josephine, had been previously married to Duncan, or to any other person. Josephine's daughter, Elizabeth, was reared as " Elizabeth Sutton," using the surname of her mother. The testimony shows that Elizabeth never used her alleged father's name Duncan. In the book entitled " Family Record " she is not even mentioned as a relation of the testatrix, although, if legitimate, she was her half-sister. Again, the omission is significant. There was no reason to suppress her existence if she was the legitimate half-sister. The testatrix in the " Family Record " mentioned the name of her full brother George William Wolff. The omission of any reference to the birth or even the existence of Elizabeth was plainly intended to conceal what was regarded as an unfortunate scandal in the family.

There is testimony showing that Elizabeth Sutton at times was known, after her mother's marriage to Julius T. Wolff, as " Elizabeth Wolff." The employment of that name was not extraordinary for children frequently are given and use the name of the stepfather. On June 22, 1863, when she was seventeen years of age, Elizabeth married her uncle, Nicholas Sutton (Septant). He was a full brother of the mother of the testatrix. Because of the blood relationship of uncle and niece between the prospective groom and bride, it was necessary to procure a dispensation for that marriage from the authorities of their church. In that dispensation, which is in evidence, the prospective bride was described as Elizabeth Wolf (a slight variation from her mother's married name " Wolff "). The church record of the dispensation in its reference to the name of the father of the prospective bride significantly states — " father's name not given." Again, there is strong indication of the illegitimacy of Elizabeth who was married

under this dispensation. From that marriage was born Josephine C. Sutton, the contestant here.

There are other facts in the record which destroy any possible inference of a marriage between Josephine Sutton and Thomas Duncan. Each party went his and her own way after the birth of the child Elizabeth. Within a few years Josephine entered into a ceremonial marriage with Wolff and by him had two children, the testatrix and her brother. Duncan, the alleged father, likewise married and had children.

Counsel for the contestant in his contention that there was a marriage between Josephine and Duncan would have the surrogate assume that the later marriage of Josephine to Wolff was bigamous and void and that the testatrix, a child of that marriage, was thereby illegitimate.

The applicable presumption invoked in such situations is to the contrary. A ceremonial marriage like that between Josephine and Wolff or like that of Thomas Duncan and his lawful wife, entered into and continued over a long period of years, with the birth of children, is presumed to be valid. (*Matter of Meehan,* 150 App. Div. 681.) It would be equally ridiculous to assume that a marriage had been entered into between Josephine and Duncan and had been dissolved by a presumed divorce rendered prior to her marriage to Wolff and that, therefore, Elizabeth, the mother of the contestant, was legitimate. There is no proof of any such marriage or divorce. Again, as stated by Chief Judge CARDOZO in *Matter of Findlay* (*supra,* p. 13): " This is the presumption of legitimacy gone mad. It is with the clash of like presumptions as it is with the conflict of estoppels. ' The bringing forward of unusual facts * * * discharges the whole matter from the operation of presumptions, and like Coke's estoppel against estoppel " doth put the matter at large." ' " (Quoting Thayer, Preliminary Treatise on Evidence, p. 351.) The declaration of the testatrix in the will and her description of the contestant as " a daughter of my half sister " are worthless to establish legitimacy in the face of the undisputed proofs. Misdescriptions of relatives frequently occur in wills. When controverted by the facts, such statements have no weight. (*Matter of Marcin,* 156 Misc. 14; affd., 246 App. Div. 740.)

Here, the presumption of legitimacy of the mother of the contestant has been riddled to the point of destruction by the array of facts in evidence. To apply it would be a mere sanctimonious pretense. " There are breaths of human nature at which presumptions shrink and wither." (*Matter of Findlay, supra.*) The disposition of the courts, and particularly of the surrogates, is to

save children from the brand of illegitimacy. On the other hand, where the fact of illegitimacy is revealed, the recognition of the rights of legitimate relations under statutory requirements may not be unjustly perverted by any sentimental consideration. (*Matter of Bruington*, 160 Misc. 34, 38; *Dieterich* v. *Dieterich*, 154 id. 714.) Presumptions may be looked upon " as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts." (*Mockowik* v. *Kansas City, St. Joseph & Council Bluffs R. R. Co.*, 196 Mo. 550; 94 S. W. 256.) They " are indulged to supply the place of facts; they are never allowed against ascertained and established facts. When these appear, presumptions disappear." (*Lincoln* v. *French*, 105 U. S. 614.)

Because of the finding of the surrogate that the mother of the contestant was born out of lawful wedlock, the contention of the contestant that she is a niece and sole next of kin of the testatrix must be overruled. It is unfortunate indeed that the unfounded change of her claim of her status has resulted in the unnecessary disclosure of her mother's illegitimacy.

Under our statute of distribution an illegitimate is not entitled to share in the estate of a parent or other ancestor of the mother of the illegitimate. (*Matter of Marcin*, 156 Misc. 14; affd., 246 App. Div. 740.) Nor may a descendant, even if born legitimate, inherit through the illegitimate mother from a collateral relation. Kinship under the Statute of Distribution always presupposes a lawful matrimonial status. (*Matter of Lauer*, 76 Misc. 117.) The establishment of the bar sinister as to any person in the line of ascent from the claimant to the common ancestor and down in the line of descent to the decedent constitutes a bar against inheritance by any person claiming through the illegitimate. (*Matter of Cady*, 257 App. Div. 129; affd., 281 N. Y. 688; *Matter of Battalico* v. *Knickerbocker Fireproof Co.*, 250 App. Div. 258; leave to appeal denied, 274 N. Y. 641.)

A somewhat similar situation to that here was passed upon by the courts in *Matter of Cady* (*supra*). There, the claimant was the illegitimate son and sole descendant of a sister of the decedent. Contention was made in his behalf that the revision of the Statute of Distribution made by the Legislature in 1929, and particularly section 81 and subdivisions 6 and 13 of section 83 of the Decedent Estate Law, were intended to abolish the rule which provided that an illegitimate could not inherit from a collateral relative of the mother. That contention was overruled by the Appellate Division and it was held that the illegitimate son was not entitled to share in the estate of the deceased brother of his mother. The court further stated: " It is a general rule of construction that when the

words ' child,' ' children ' or ' descendants ' are used in a statute the meaning is legitimate or lawful children or descendants." (Citing *Bell* v. *Terry & Tench Co.*, 177 App. Div. 123; *Matter of Miller*, 110 N. Y. 216.)

The revision of 1929 was made after long investigation and intensive study by the Decedent Estate Commission, of which the author of this decision was chairman. The only changes intended were set forth in the explanatory notes of the Commission which were printed in the legislative bill, thereby becoming indications of the legislative intent. (Combined Reports, Dec. Est. Commission, p. 119.) Certainly, the Commission never intended to change the fundamental rule of the common law which had been embodied in our previous Statute of Distribution. (*Matter of Lauer, supra; Matter of Belcher*, 149 N. Y. Supp. 479; *Bell* v. *Terry & Tench Co., supra.*) However, any dispute as to the meaning and effect of the revision has forever been quieted by the decision of the Appellate Division in *Matter of Cady* (*supra*) and its unanimous affirmance by the Court of Appeals.

In 2 Jessup-Redfield Surrogates' Courts ([8th ed.] pp. 2779, 2793, 2795 and 2803) there is an excellent and very careful analysis and review written by Surrogate FEELY of Monroe county of the changes made in the 1929 revision entitled " Descent and Distribution." In it there are accurately set forth (1) the right of inheritance from an illegitimate decedent under subdivision 7 of section 83 of the Decedent Estate Law; (2) the limited right of an illegitimate to inherit from his or her mother and the right of the descendants of the illegitimate to inherit from such mother under subdivision 13 of section 83 of the Decedent Estate Law, where there is no lawful issue, and (3) the absence of any other right of an illegitimate or of the child or descendant of an illegitimate to inherit from an ancestor decedent or from a collateral relative decedent through any intervening blood relation who may have been illegitimate. (Section 83 of the Decedent Estate Law generally and the pertinent rule made by judicial decision.)

The surrogate determines upon the merits, therefore, that the contestant is not the lawful niece of the testatrix and is not entitled to contest the will in that capacity. However, it does appear in this complicated problem of kinship that the contestant is a first cousin of the testatrix. That relationship is based upon the fact that the mother of the contestant married an uncle by the blood. He was the brother of the mother of the testatrix. In her status as a first cousin and one of the next of kin of the testatrix the contestant is entitled to contest the will. The motion to dismiss her objections, therefore, is denied without prejudice to a showing

that the contestant's pecuniary interest by intestacy would be less than her pecuniary interest under the will. The latter situation has been brought about by the revelation upon the trial that the contestant is not the sole first cousin of the decedent. Her original claim to that effect was false. By her own testimony she has admitted that there are nine other first cousins who survived the testatrix, making a total of ten known persons within that group. In addition, there is indication in the proofs that there may be other first cousins. If it can be shown that the share of each one of the next of kin, including the contestant, was less by intestacy than the share given to the contestant by the will, she would be without any lawful right to contest. (*Matter of Davis*, 182 N. Y. 468, 472; *Matter of Hoyt*, 55 Misc. 159; affd., 122 App. Div. 914; affd., 192 N. Y. 538.) Her objections would be stricken out upon a proper motion.

Submit order on notice accordingly.