JAMISON v. METROPOLITAN LIFE INS. CO. et al.—145 S. W. (2d) 553.

Middle Section.   July 13, 1940.

Petition for Certiorari Denied by Supreme Court, December 14, 1940.

J. B. Daniel and J. N. Daniel, both of Nashville, for appellant S. A. Jamison.

Jordan Stokes, Jr., and Chas. A. Embry, both of Nashville, for appellee Mrs. Ruby Jamison.

CROWNOVER, J.  The bill in this cause was filed by S. A. Jamison against the Metropolitan Life Insurance Company, the Police and Firemen's Benefit Association, the American National Bank, administrator of the estate of Sam Jamison, deceased, and Mrs. Ruby Jamison, to recover on two insurance policies and to enjoin the defendant Mrs. Ruby Jamison from collecting the proceeds of the insurance on the life of her husband, Sam Jamison.

It was alleged in the bill that the defendant, Ruby Jamison, had wrongfully killed her husband and was seeking to collect the proceeds of two insurance policies on his life from the defendants, but she was not entitled to the same because she had feloniously shot and killed him; that the defendant American National Bank had qualified as his administrator; that the decedent had no children; and that the complainant was his father and as the next of kin he was entitled to the proceeds of this insurance.

The defendant Insurance Companies filed bills of interpleader in the nature of cross-bills and paid the proceeds of the insurance into court.

The defendant Ruby Jamison filed an answer as a cross-bill in which she denied that the death of Sam Jamison was the direct result of her felonious act, and alleged that she was named beneficiary in the policies and as such was entitled to receive the proceeds of same; and demanded a jury.

The issue submitted to the jury was:

"Did Ruby Jamison, on or about the 17th day of October, 1938, feloniously, wrongfully, and unlawfully assault and kill Sam Jamison by shooting him several times with a pistol?"

After hearing the evidence the jury returned the answer, "No."

The complainant moved the court for a decree notwithstanding the verdict, which motion was overruled, and he then filed a motion for a new trial, which was also overruled.

The court rendered a decree for $1,729.85 in favor of Ruby Jamison, to which the complainant excepted, and appealed to this court and assigned errors, which are, in substance, as follows:

(1)  The court erred in overruling complainant's motion for a

decree for the proceeds of the insurance notwithstanding the verdict of the jury.

(2)  The court erred in failing to grant a new trial.

(3)  The court erred in rendering a decree for cross-complainant Ruby Jamison, for the following reasons:

"(a)  There is no believable testimony in the case that would justify the verdict of the Jury on the action of the trial Court.

"(b)  The defendant's own statements show she murdered her husband. She does not claim she acted in self-defense or that her pistol was accidentally discharged.

"(c)  The record is uncontradicted to the effect that the defendant armed herself with a six shooting loaded pistol, and started out, mad, on the hunt for her husband, and broke down the front door of a private residence by using a piece of a discarded bicycle, and when she saw him running from her toward the kitchen door, opened fire on him, hit him once before he got the door closed between them, powder burning him, and then shot him five times through the door. The trial court was grossly in error in placing a premium on her conduct, and in rewarding her for her murderous acts by giving her this money as earned by her unlawful conduct."

The facts necessary to be stated are that the deceased, Sam Jamison, was a policeman, and married the defendant Ruby Jamison some time before his death; that they had no children; that some time after they were married he became intimate with a woman by the name of Frances Duke and began visiting her, and continued to do so until he was killed by his wife on October 17, 1938.

It appears that he left home on that morning and visited Frances Duke at a house of ill-fame on Putnam Street.

Mrs. Jamison testified that after he left home she put one of his pistols in her pocketbook and went in a taxicab to some place near that house, and upon inquiry she located the house and knocked on the front door, and the inmates would not open it; that she again knocked on the door without any response; that she then went out into the yard and obtained a small wheel from a child's toy wagon or tricycle and with it she broke the glass in the front door, reached in and unlocked the door, and when she entered the house she saw Ollie Vanderpool, the proprietress, and also her husband, Sam Jamison, who was going through the middle room toward the kitchen; that she called to him and asked him to stop, saying that she wanted to talk to him; but he went on through the middle room and on through the door leading into the kitchen, and shut the door; that she came to that door and pushed or tried to open it but could not do so; that she then took the pistol out of her pocketbook and fired through the door five times, but did not intend to kill him; that she did not know that he was behind the door, but her purpose was to cause a disturbance so that an investigation would be made of the

house, and to, if possible, make him behave himself; that this might cause an investigation by his superior officers in the Police Department, and would show up his relations with Frances Duke; that a short time after she fired the last shot through the door Sam opened the door and came into the room and he said: "Honey, you have shot me," or "You have killed me," put his arms about her and sank to the floor; that she began crying and became hysterical; that, as a matter of fact, when she shot through the door she had no idea that Sam was behind the door, as she thought Sam would be on the side. She denied saying at the time that she intended to kill him and herself, and she denied that she made a statement before going to this house that she was going to kill Sam and called him vile names.

Her insistence is that she was seeking to reclaim Sam and had no intention of killing him.

He had two policies of insurance for $1,000 each, payable to his wife, on one of which he had obtained a loan, and there was a balance of the proceeds amounting to $1,729.85.

█ 1. There is nothing in the assignment that the court erred in not rendering a decree notwithstanding the verdict. "A motion for a judgment non obstante veredicto is a test of pleadings, and is inapplicable when applied to a question of evidence." Citizens' Trust Co. v. Motor Car Co., 154 Tenn., 507, 297 S. W., 735. There is nothing in the pleadings that would warrant a decree notwithstanding the verdict. This assignment must be overruled.

2. The motion for a new trial was not applicable to this case, for the reason that there was no material evidence, taking the cross-complainant Mrs. Jamison's own statements as true, upon which a verdict in her behalf could be rendered.

According to her own evidence, this killing was not accidental nor done in self-defense, and therefore there was no evidence to sustain a verdict in her behalf on these issues, as will be hereinafter shown.

██ Under the practice in Tennessee in jury trials in the Chancery Court, a motion for a directed verdict is improper. Where material evidence on a material issue is uncontroverted, the parties should move the court to withdraw the issue from the jury, or, in the absence of such motion, it is the duty of the chancellor to withdraw that issue from the jury and decide it himself. In which event, a motion for a new trial on that issue is unnecessary, as the question will be reviewed in the appellate court de novo. Carpenter v. Wright, 158 Tenn., 289, 13 S. W. (2d), 51; Mutual Life Ins. Co. v. Burton, 167 Tenn., 606, 72 S. W. (2d), 778; Hibernia Bank & Trust Co. v. Boyd, 164 Tenn., 376, 48 S. W. (2d), 1084.

██ The same rule applies where immaterial issues have been submitted to the jury. It is the duty of the chancellor to disregard such immaterial issues and to decide the case on the evidence, if there is sufficient evidence for a final adjudication of the case. A

review of the case under such circumstances will be de novo in the appellate court, without a motion for a new trial. Carpenter v. Wright, supra; Mutual Life Ins. Co. v. Burton, supra. Hence, it was the duty of the chancellor to have taken the case from the jury and to have decided the case himself. Motions for a directed verdict and for a new trial in this case were unnecessary. This assignment is therefore overruled.

3. It is insisted by the third assignment of error that according to Mrs. Jamison's own statements about the incidents leading up to and about the killing she was guilty of an unlawful killing, which was not accidental and was not done in self-defense; and her statement that she did not intend to kill him is so improbable and unreasonable that it has no weight as evidence, as she is conclusively presumed to have intended the natural consequences of her voluntary act.

We think this assignment should be sustained. On the day of the tragedy she armed herself with a loaded pistol, engaged a taxicab, and drove to the scene of the killing, and after ascertaining the right house she demanded entrance, which was refused, then she unlawfully broke open the door and unlawfully forced herself into the residence, called her husband who was retreating, and after he had closed the door, she shot through the door, striking him six times, which caused his death. All the shots took effect in his body. She was guilty of carrying a pistol, unlawfully breaking into the house, and unlawfully assaulting him after she had unlawfully obtained an entrance. Now she insists that she did not intend to kill him and that the tragedy was an accident.

A statement of a fact by a witness, however positively made, should be weighed in connection with all the circumstances of the case, and if these circumstances show the untruthfulness of the testimony it should be disregarded. Nashville, Chattanooga & St. Louis Railroad v. Justice, 5 Tenn. Civ. App., 69, 71; Atlantic Works v. Brady, 107 U. S., 192, 2 S. Ct., 225, 27 L. Ed., 438.

One is conclusively presumed to intend the natural consequences of his voluntary acts. 10 R. C. L. 874.

"Rational beings are presumed to intend the natural and reasonable consequences of their acts, and fair inferences from established facts are oftentimes more reliable and persuasive of the truth, especially when intent or purpose is involved, than oral statements concerning them." Vermont v. United States, 8 Cir., 174 .F., 792, 795; Quock Ting v. United States, 140 U. S., 417, 11 S. Ct., 733, 851, 35 L. Ed., 501.

"The doctrine in brief is this, that any employment of unlawful force, whereby the death of a human being is produced, whether intended or not, will subject the doer to indictment for a felonious homicide. If the force is of a kind not lawful under the circumstances, it

comes within the condemnation, however accidental the death may be. If, being of the lawful sort, it is employed to an extent unlawful, it is the same as if it were unlawful in kind. Therefore a full discussion of this question would reach into every department of legal science, and exhaust the whole. But, to repeat in part, firing a loaded gun into a traveled way, or at a person supposed to be too far distant to be reached by it, or discharging loaded fire-arms in any careless manner for the purpose of frightening another, or administering a deleterious drug, or correcting with an improper instrument one under subjection, or correcting such a one by too severe a punishment, or forcing a person to perform any act dangerous to life, or entering in anger into a struggle by fighting or otherwise, or an affray, or committing any other breach of the peace, or doing any other thing not warranted by the law—is such a wrongful exhibition of elements unlawful as subjects the party putting them in motion to the charge of felonious homicide, if death however unintended follows.'' Bishop on Criminal Law (7 Ed.), sec. 657; Banks v. State, 85 Tex. Cr. R., 165, 211 S. W., 217, 5 A. L. R., 600; Lauterbach v. State, 132 Tenn., 603, 179 S. W., 130.

A beneficiary in a life insurance policy who unlawfully kills the assured will not be allowed to reap the benefits of his own crime. Box v. Lanier, 112 Tenn., 393, 79 S. W., 1042, 64 L. R. A., 458; Mutual Life Ins. Co. v. Armstrong, 117 U. S., 591, 6 S. Ct., 877, 29 L. Ed., 997.

''Any person who shall kill, or conspire with another to kill, or procure to be killed, any other person from which said first named person would inherit the personal property, or any part thereof, belonging to such deceased person at the time of his death, or who would take said property, or any part thereof, by deed, will or otherwise, at the death of the deceased, shall forfeit all right therein, and the same shall go as it would have gone by the law of distribution, will, deed or other conveyance, as the case may be; provided, that this section shall not apply to any such killing as may be done by accident or in self-defense.'' Code, sec. 8395.

It will thus be seen that since the enactment of the above statute, where one kills another in any manner other than by accident or in self-defense, he will forfeit all right to insurance.

There is no pretense that she killed him in self-defense, but she insists that she did not intend to kill him and therefore it was an accident. If one presents a pistol to another's head and pulls the trigger and death results, or where one shoots into a room crowded with people and kills somebody, he is conclusively presumed to have intended to kill him. Hence the defense of accident is not available, and this assignment must be sustained.

It appears that Mrs. Jamison was indicted for murder in the Criminal Courts of Davidson County and at the trial was

acquitted. It may be contended that the judgment of acquittal is res adjudicata. This contention is not tenable for the reason that res adjudicata was not pleaded in this case, and for the further reason that a judgment in a criminal case is not res adjudicata in a civil case growing out of the same tragedy. 34 C. J., 970, secs. 1387, 1388; 1 Greenleaf on Evidence, 537; Dyer County v. Railroad, 87 Tenn., 712, 11 S. W., 943; Massey v. Taylor, Wood & Co., 45 Tenn. (5 Cold.), 447, 98 Am. Dec., 429.

The reasons why the judgment of acquittal is not res adjudicata are that the suits are not between the same parties, and the rules of evidence are different. In the criminal case the jury must believe that she was guilty of murder beyond a reasonable doubt, whereas in the civil case the preponderance of evidence rule prevails.

It results that as the third assignment of error has been sustained the decree of the lower court is reversed, and a decree will be entered in this court for $1,729.85 in favor of S. A. Jamison, and the proceeds of the policies will be paid to him.

The costs of the cause including the costs of the appeal are decreed against Ruby Jamison.

It appearing that the proceeds of the policies have been paid into the lower court, the cause will be remanded to the Chancery Court of Davidson County with an order that the clerk and master pay the proceeds of the policies to S. A. Jamison.

Felts, J., and Higgins, S. J., concur.