106 N.J. Super. 61 (1969)
254 A.2d 141
STELLA MAE JACKSON, PLAINTIFF,
v.
THE PRUDENTIAL INSURANCE CO. OF AMERICA, A CORPORATION OF THE STATE OF NEW JERSEY; RONALD ODELL JACKSON, AN INFANT, BY HIS GUARDIAN AD LITEM, MARTIN KRAFT; ELLEN C. BEVERLY; AND DELMAS L. JACKSON, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 26, 1969.
*64 Mr. James B. Brown, Jr., for plaintiff (Mr. Daniel L. Golden, attorney).
Mr. Nathan Kurtz, for defendant Ronald Odell Jackson, an infant, by his guardian ad litem, Martin Kraft.
Mr. Michael A. Cohan for defendant Ellen C. Beverly (Mr. Edwin A. Kolodziej, attorney).
Mr. George G. Kress for defendant Delmas L. Jackson.
SEIDMAN, J.C.C. (temporarily assigned).
Claudius Lee Jackson died April 20, 1966, as the result of a gunshot wound inflicted by his wife Stella Mae Jackson, plaintiff herein. Mrs. Jackson was subsequently indicted for manslaughter, tried *65 and convicted. She instituted this suit against The Prudential Insurance Company of America to obtain the proceeds of a policy of insurance issued under the Serviceman's Group Life Insurance Program, authorized by P.L. 89-214, 79 Stat. 880, 38 U.S.C.A. §§ 765-776, and underwritten by Prudential as the prime insurer. The amount of insurance afforded decedent was $10,000.
After obtaining an order to add as defendants plaintiff's infant son, Ronald Odell Jackson; decedent's mother, Ellen C. Beverly, and Delmas L. Jackson, decedent's natural father, Prudential filed a counterclaim and cross-claim in the form of interpleader to have the rights of the parties to the money determined. The insurance proceeds were paid into court to await the outcome of the litigation, and the complaint was dismissed as to Prudential.
Decedent did not designate any named person as beneficiary; instead, he requested that payment be made in the order of precedence set forth in P.L. 89-214, 38 U.S.C.A. § 770 (a). This section provides, in pertinent part, that in the absence of a designated beneficiary, payment shall be made to the survivor or survivors in the following order: to the widow or widower; if none, to the child or children of the insured and descendants of deceased children, and if no surviving spouse or children or descendants of deceased children, to the parents of the insured or the survivor of them.
There is a tangled web of opposing claims. Mrs. Jackson demands the proceeds as decedent's widow. The others are united only in their contention that the homicide precludes her recovery. Ronald Odell Jackson, represented by a guardian ad litem, asserts that he is next in line. The position of Mrs. Beverly is that she is the sole eligible party. She charges that Ronald is illegitimate, the decedent having been stationed with the armed forces in Greece for more than 11 months prior to the birth of the child. She also asserts the illegitimacy of the decedent, contending that she and Delmas L. Jackson had never been married. The latter seeks one half of the proceeds on the ground that the decedent was his natural *66 son. The crux of the controversy is, of course, whether Mrs. Jackson, having caused the death of her husband, is debarred. That issue necessarily must be resolved first.
With respect to these proceedings, the fact that the plaintiff was convicted of manslaughter is not dispositive of the issue. It is true that generally, in a civil proceeding, "evidence is admissible of a final judgment against a party adjudging him guilty of an indictable offense in New Jersey * * * as against that party to prove any fact essential to sustain the judgment." (Evidence Rule 63 (20); emphasis supplied). But Mrs. Jackson denied neither the homicide nor the conviction; and none of the parties sought to invoke the rule for any other purpose. Consequently, a plenary trial was had before the court, sitting without a jury, to determine whether the circumstances of the homicide were such as to prevent Mrs. Jackson from claiming the insurance proceeds.
Two versions of the homicide were developed at the trial. One was related by Mrs. Jackson; the other, testified to by Captain Silvio J. Donatelli of the Middlesex County Prosecutor's office, consisted of statements allegedly made to him by Mrs. Jackson the night of the incident. At that time she and her husband, who was still in military service, lived in an apartment in New Brunswick. Mrs. Jackson testified that her husband had visited a friend earlier in the evening and had returned home about 11 P.M. While he was in the bathroom, she said, she removed a pistol from under the mattress in the bedroom and began playing with it, in the course of which she cocked the gun. She stated that she then went into the bathroom to get her husband to uncock the weapon. He warned her not to play with the pistol because it had a hair trigger. She walked forward with the gun in her right hand, placed her arms around her husband, and hugged him. At that moment, according to Mrs. Jackson, she heard her child cry out in an adjoining room. Startled, she jumped back; as she did so, the pistol went off and her husband was mortally wounded. Further interrogation by counsel elicited *67 from Mrs. Jackson that she had drunk about half a pint of whiskey that night. In response to an inquiry by the court, she said she did not know why she had taken the gun from under the mattress.
Captain Donatelli testified that he began his interrogation of Mrs. Jackson, after advising her of her rights, at 12:55 A.M. following the shooting, and completed it about 3:40 A.M. Her recital of what had occurred was substantially as follows: During the afternoon she had looked after the children of Mr. and Mrs. Fisher, who lived nearby. Mrs. Fisher picked up the children at the Jackson apartment about 5:30 P.M., but brought them back later while she and her husband went shopping. The children were taken home about 6:25 P.M. Mrs. Jackson and her husband went to a store to buy a half-pint of Old Crow and a large bottle of a soft drink, and they had a couple of drinks upon returning home.
At about 8:40 P.M. Mrs. Fisher telephoned and said that her husband wanted to borrow some "brass"  apparently referring to buttons on a military uniform. Decedent left for the Fisher home, and Mrs. Jackson remained home watching television. She finished the half-pint of Old Crow and also drank two bottles of ale. Later on she called the Fishers to inquire when her husband intended to come home. After he returned, as both lay on the bed, Mrs. Jackson said to him, "Claudius, tell me the truth, what took you so long?" He responded, "Nothing; I was just yacking," and then went into the bathroom. Mrs. Jackson took the gun from under the mattress, walked into the bathroom, pointed the gun at her husband, and said, "Tell me the truth or I'll shoot you." He laughed and she then said, "Don't laugh or I'll shoot you". He replied, "Stella, don't wave that gun," and then jumped up from the commode. Although Mrs. Jackson claims she heard no noise, she saw her husband holding his chest. He walked toward the front door and collapsed.
Although, in rebuttal, Mrs. Jackson did not deny the quotations attributed to her by Captain Donatelli, she stated she could not recall anything she had said to the detective *68 during the questioning. She insisted that she had not intended to harm her husband.
Depending upon what is proven, a homicide may constitute the crime of murder, either first or second degree, or manslaughter, voluntary or involuntary. N.J.S.A. 2A:113-1, 2A:113-2, 2A:113-5. But it may also be the result of misadventure, or in defense, or to prevent certain felonies, in which case the slayer is guiltless. N.J.S.A. 2A:113-6. No matter which version of the occurrence in question is accepted, it is clear that the homicide was not in self-defense, nor was it to prevent a felony. Plaintiff contends that the shooting was accidental and without any intention of hurt; for this reason, the death being through misfortune or misadventure, she claims she ought not to be barred from receiving the insurance proceeds. She urges, in addition, that even if the homicide constituted manslaughter, she is still entitled to the money. Defendants do not concede that the mishap resulted from accident. Their position is that Mrs. Jackson intentionally killed her husband, and that she is thereby barred from the proceeds.
It is the law of this State that a beneficiary who murders an insured is precluded from recovering the proceeds of a policy of insurance on the life of the victim. Swavely v. Prudential Ins. Co. of America, 10 N.J. Misc. 1, 157 A. 394 (Sup. Ct. 1931); Merrity v. Prudential Ins. Co. of America, 110 N.J.L. 414 (E. & A. 1933); Turner v. Prudential Ins. Co. of America, 60 N.J. Super. 175 (Ch. Div. 1960). This is so because to permit a murderer to retain property acquired by his crime is contrary to public policy and violates the common law precept that no one shall be allowed to profit by his own wrong. Neiman v. Hurff, 11 N.J. 55 (1952); In re Estate of Kalfus, 81 N.J. Super. 435 (Ch. Div. 1963); Estate of Wolyniec v. Moe, 94 N.J. Super. 43 (Ch. Div. 1967).
At the other end of the spectrum is accidental homicide, in which case the rule appears to be that the slayer can acquire the property of the deceased or the proceeds of insurance on *69 the deceased's life. In Campbell v. Ray, 102 N.J. Super. 235 (Ch. Div. 1968), the court said:
"The question presented here [lack of mental capacity] has been answered in the decisions of courts of other jurisdictions. A reading of those decisions leads to the conclusion that there are three situations in which acquisition of property from one deceased is permitted to his slayer even though the events leading to the transfer of the property in question were initiated by a murder. Thus, it has been held that a wrongdoer may acquire property from his victim if the slayer is insane at the time of the commission of his act if the killing was accidental or in self defense, or if the wrongdoer was convicted of the reduced charge of manslaughter." (at p. 239)
On the issue of accidental homicide, the cases of Shoemaker v. Shoemaker, 263 F.2d 931 (6 Cir. 1959), and Jamison v. Metropolitan Life Ins. Co., 24 Tenn. App. 398, 145 S.W.2d 553 (Ct. App. 1940), suggest by inference that a slayer is permitted to recover insurance proceeds if it is established that the killing of the insured was accidental.
There is no reported case in this State which definitely resolves the problem of whether a beneficiary who kills the insured can receive the insurance proceeds where the homicide is determined to be manslaughter. Does manslaughter bar the slayer regardless of whether it is voluntary or involuntary? If so, it would follow that the beneficiary can prevail only if the proofs establish an accidental killing or any kind of justifiable or excusable homicide. On the other hand, if manslaughter, whether voluntary or involuntary, is not a bar, then is the beneficiary entitled to the proceeds unless the proof establish murder? Is recovery barred in the case of voluntary manslaughter, but not in the case of involuntary manslaughter?
The basic concept, as set forth in Schreiner v. High Court, I.C.O.F., 35 Ill. App. 576 (App. Ct. 1890), is that while a beneficiary cannot recover where the death of the assured has been intentionally caused by his act, if the homicide is the result of carelessness and is not intentional, it does not bar the beneficiary's rights under the policy. Two frequently cited cases are Metropolitan Life Ins. Co. v. McDavid, *70 39 F. Supp. 228 (E.D. Mich. 1941), and United States v. Kwasniewski, 91 F. Supp. 847 (E.D. Mich. 1950). McDavid involved the question whether a wife who had killed her husband in circumstances establishing the crime of manslaughter was barred from receiving the proceeds of a policy on the decedent's life. The court comprehensively reviewed existing law:
"* * * This court now finds the fact to be that Mrs. McDavid at the time she killed her husband was not intoxicated, she was of sound mind, she was not acting in self-defense. Her husband had given her provocation for being angry, she was angry, there had not been a cooling time, she intended to kill her husband, and she did kill him.
Do these findings of fact bar her from receiving and enjoying the proceeds of the life insurance policies in force upon her husband's life at the time of his death? No case from any court has been found which passes upon this question where this kind of mansalughter is involved. There are many cases holding that murder by the beneficiary of the insured bars a recovery of the benefits. * * * While all of these adjudicated cases were in fact murder cases, the underlying reason why recovery was denied was not because the manner of death was murder, but because the killer while of sound mind, and not in self-defense, intentionally killed the benefactor. This brief definition fits all of those cases and, to the extent that the opinions go beyond that definition and say that all murder will bar, the opinions are dictum. * * * No cases have been found which hold that a person is barred from receiving the benefits under a life insurance policy or under a will, or by inheritance, unless he killed and intended to kill the person from whom he was to receive the benefits. In other words, as far as the law has ever gone is to prevent the recovery of benefits which would not have become due and payable except for the intentional taking of the life of the benefactor.
Now, in the same way, there are many decisions which hold that a beneficiary guilty of manslaughter is not barred from recovery in cases which are called manslaughter cases. These cases, which have held that there can be recovery and which are called manslaughter cases, are all cases in which there was no intent on the part of the killer to take the life of the benefactor. Minisian v. Aetna Life Ins. Co., 295 Mass. 1, 3 N.E.2d 17; Schriener v. High Court, 35 Ill. App. 576; Metropolitan Life Ins. Co. v. Hill, 115 W. Va. 515, 177 S.E. 188; Throop v. Western Indemnity Co., 49 Cal. App. 322, 193 P. 263; Hull v. Metropolitan Life Ins. Co., 26 Pa. Dist. R. 197; see Restatement, Restitution, § 187, Comment e. Cf. In re Wolf, 88 Misc. 433, 150 N.Y.S. 738; In re Sparks' Estate, 172 Misc. 642, 15 N.Y.S.2d 926. * * *

* * * * * * * *
*71 It is necessary to keep in mind that running through the adjudicated cases the real reason for not permitting recovery is that the beneficiary intentionally took the life of the insured and that the intentional act should not place the beneficiary in position to enjoy a benefit which would not have been enjoyed and could not have been enjoyed except for the wicked intentional killing. That manner of reasoning which has controlled these murder cases applies equally well to the case at bar, which is a manslaughter case because here the beneficiary intentionally took the life of the insured."
In Kwasniewski defendant shot and killed his wife, the mother and principal beneficiary of the insured, who had died in military service, leaving a policy of National Life Insurance in which defendant, the step-father of the serviceman, was named as contingent beneficiary. Although Kwasnieski was acquitted of the murder charge, the jury having found that the killing occurred during a period of temporary insanity, the court, in the civil proceeding to determine who was entitled to the insurance proceeds, held that the homicide was intentional and felonious, differentiating a killing during a moment of temporary insanity, induced by emotional disturbance, from a murder by an insane person. The court noted that recovery is allowed in cases of involuntary manslaughter where an unintentional killing results from the commission of an unlawful act not amounting to a felony or from gross negligence.
In the case of Throop v. Western Indemnity Co., 49 Cal. App. 322, 139 P. 263 (D.Ct.App. 1920), decedent's husband, who had caused her death by accidentally discharging a shotgun, was permitted to recover the proceeds of accident insurance policies, even though the husband was found grossly negligent. The rationale is discussed in the case of Prudential Ins. Co. of America v. Harrison, 106 F. Supp. 419 (S.D. Cal. 1952). Under California law, manslaughter is either voluntary, upon a sudden quarrel or heat of passion, or involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection. The former involves an intent *72 to kill; in the latter the killing is unintentional. Harrison distinguishes McDavid and Throop:
"* * * Mr. Throop committed a wrong when he carelessly toyed with a loaded shot gun in front of his wife. But his acts which led to the discharge of the gun with fatal results did not proceed from an intent to do any wrong. His was a tort of omission, rather than of commission. He did not intend to do any illegal act. He was careless and negligent, even grossly negligent. He did not intend to hurt his wife to any extent. In this he differed from Mrs. McDavid. Her intent was generated and executed on a sudden quarrel, so it was robbed of malice and her crime but manslaughter. Mr. Pounds' intent (the slayer in Harrison) differed from Mr. Throop's. The latter meant only to handle a gun. In this he disregarded rules of safety. Mr. Pounds intended to manhandle his wife. He meant to commit battery. He committed a very substantial battery. Public policy is against chastisement of the kind he intended to administer his wife. Public policy abhors settlement of disputes, even marital quarrels, by violence. When Mr. Pounds went against that public policy, it rose up to bar him from benefiting from even its unintended consequences. The Court is convinced he did not intend the result. Conviction is equally firm that he did intend to inflict hard physical blows upon his wife. He wilfully entered a forbidden activity of a kind which often brings about results of the sort which developed here. His offense was not mere negligence. He intended to do a physical hurt. He cannot benefit from the miscalculation which led him to injure beyond his intention. Although guilty only of involuntary manslaughter, the wrong out of which the manslaughter grew was wilful and of a type known sometimes to produce the result which it did produce. This bars him from profiting thereby."
It is clear from these cases that the underlying principle is not so much whether the homicide is technically classified as murder or manslaughter, or, in the latter case, whether the manslaughter is voluntary or involuntary, although the essential elements of each offense are of importance. The true test is whether the beneficiary intentionally took the life of the insured. See also Minasian v. Aetna Life Ins. Co., 295 Mass. 1, 3 N.E.2d 17 (Sup. Jud. Ct. 1936); Jamison v. Metropolitan Life Ins. Co., supra; Greer v. Franklin Life Ins. Co., 148 Tex. 166, 221 S.W.2d 857 (Sup. Ct. 1949); United States v. Burns, 103 F. Supp. 690 (D. Md. 1952); Carter v. Carter, 88 So.2d 153 (Fla. Sup. Ct. 1956); Chase v. Jenifer, 219 Md. 564, 150 A.2d 251 (Ct. App. *73 1959); Rosenberger v. Northwestern Mutual Life Ins. Co., 176 F. Supp. 379 (D. Kan. 1959); In re Estate of Mahoney, 126 Vt. 31, 220 A.2d 475 (Sup. Ct. 1966).
Thus, in the present case the court must determine from the conflicting proofs what actually occurred on the night in question, and whether the homicide was accidental or otherwise unintentional, or intentional. Mrs. Jackson contends that the shooting was accidental and thus without intent to harm decedent. If her version of the occurrence is accepted, the homicide could conceivably be considered the result of misadventure. Homicide through misadventure occurs where a person is doing a lawful act, without any intention of hurt, and unfortunately kills another. 2 Schlosser, Criminal Laws of New Jersey, § 1448, p. 697. At worst, the act would constitute involuntary manslaughter, if it should be determined that the handling of the gun was reckless and wanton and of such character as showed an utter disregard for the safety of another in circumstances likely to cause death. State v. Weiner, 41 N.J. 21, 26 (1963).
However, Mrs. Jackson's explanation of the occurrence is not credible. It is wholly unlikely that, for no apparent reason other than a whim, she would take the pistol from under the mattress, cock it, and then seek the aid of her husband to render it safe. Captain Donatelli's account of what plaintiff told him within a few hours of the shooting is more acceptable. The court finds the facts to be that when decedent returned home after visiting his friend, his wife demanded an explanation for the length of his absence; that his response did not satisfy her; that after he went into the bathroom she took the gun, followed him and threatened to shoot him if he did not tell her the truth; that she repeated her threat to shoot when he laughed at her, and that the gun was then fired, causing Jackson's death. It is not entirely clear from the evidence before the court whether Mrs. Jackson deliberately pulled the trigger or whether it was discharged because of pressure on what she described as a "hair trigger."
*74 The court does not consider the homicide to have been a willful, deliberate and premeditated killing which would constitute the crime of murder in the first degree. It is also clear that the act was not voluntary manslaughter, which is a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off. State v. Guido, 40 N.J. 191, 209 (1963); State v. Wynn, 21 N.J. 264, 270 (1956). Mrs. Jackson may have been angered by her husband's refusal to answer her question, and further annoyed by his laughing at her, but there are no facts to justify the conclusion that she was so enraged as to prevent thought and reflection, or that there was adequate provocation for her conduct. 1 Wharton, Criminal Law and Procedure, §§ 275, 276.
It is elementary law that a homicide with a deadly weapon in itself justifies a factual presumption of an intent to take life. State v. Maioni, 78 N.J.L. 339 (E. & A. 1909); State v. Jones, 115 N.J. Law 275 (E. & A. 1935); State v. Peterson, 10 N.J. 155 (1952); State v. Beard, 16 N.J. 50 (1954). Even if Mrs. Jackson did not intend to kill her husband, it can be inferred from her threats and the brandishing of the gun that her intent was at least to do grievous bodily harm if he did not answer her questions. Alternatively, if the killing was in the heat of passion, it was without justifiable provocation. In either case, the killing is classified in the criminal law as murder in the second degree. 1 Wharton, op. cit., § 265; State v. Gardner, 51 N.J. 444, 445 (1968).
Regardless of the category in which the homicide in this case is to be placed, the killing resulted from an intentional act on the part of Mrs. Jackson, and not from accident or carelessness. As was said in Prudential Ins. Co. of America v. Harrison, supra, public policy abhors settlement of disputes by violence. Mrs. Jackson ought not to be permitted to profit from her wrongdoing in the existing circumstances. The court concludes, therefore, that she is precluded from *75 receiving the proceeds of the policy of insurance on the decedent's life.
The issue now to be determined is which of the remaining claimants is entitled to the proceeds. It has been adjudicated in this State that in cases where the courts will not allow a wrongdoer to enrich himself as a result of his own criminal acts at the expense of an innocent person, equity raises a constructive trust which it imposes on the property in question because of the unreasonable mode of its acquisition and thereby prevents unjust enrichment of the wrongdoer. Campbell v. Ray, supra. See also Neiman v. Hurff and In re Estate of Kalfus, supra. A slayer who is next of kin of an intestate victim is a constructive trustee for the other heirs or next of kin. Estate of Wolyniec v. Moe, supra.
Ronald Odell Jackson claims the proceeds, contending that he is decedent's son. Both Ellen C. Beverly and Delmas L. Jackson assert that decedent was not the father of the child, and that the claimant, being illegitimate, is not a next of kin and therefore cannot take the proceeds. Their burden is a heavy one. A child born or conceived prior to the dissolution of the marriage is by the common law presumed to be the legitimate offspring of the husband and wife. Wallace v. Wallace, 73 N.J. Eq. 403 (E. & A. 1907); In re adoption by K., 92 N.J. Super. 204 (Cty Ct. 1966). The presumption is rebuttable. Wallace v. Wallace, supra; B. v. O., 50 N.J. 93 (1967); Cortese v. Cortese, 10 N.J. Super. 152 (App. Div. 1950). But, to establish the illegitimacy of a child born in wedlock, the proof must be such that "there is no possible escape" from that conclusion. In re Rogers' Estate, 30 N.J. Super. 479 (App. Div. 1954); Egnozzi v. Egnozzi, 17 N.J. Super. 433 (App. Div. 1952). The presumption may be rebutted by proof of nonaccess. Wallace v. Wallace and In re adoption by K, supra; Annotation, "Presumption of legitimacy," 7 A.L.R. 329 (1920).
The birth certificate of the child attests that he was born February 23, 1965, in Pulaski, Virginia. Claudius Lee Jackson is named therein as the father. Notwithstanding these *76 facts, Mrs. Jackson revealed in her testimony that her husband was stationed in Greece for about 16 months while serving in the army, and that she became pregnant about three months after he had gone. She identified as the father one James Junior Hale. It is undisputed that decedent was overseas for more than a year, and that Mrs. Jackson resided in this country during that time. Appended to the trial brief submitted in behalf of Ellen C. Beverly is a copy of a request for admissions addressed to all the parties, indicating that decedent was out of the country from March 10, 1964 to August 31, 1965, and supported by a certificate issued by the Department of the Army setting forth not only the length of decedent's assignment, but also the absence of any record showing the granting of leave for the purpose of returning to the continental United States.
From March 10, 1964 to February 23, 1965 there are 350 days. It is common knowledge that the duration of a human pregnancy is about 280 days; consequently, conception in this case should have occurred sometime in May 1964. Leaving aside, for the moment, Mrs. Jackson's testimony regarding the paternity of the child, the question is whether a period of 350 days is so far in excess of the normal term of gestation as to make it impossible for the decedent to have been the father of the child.
In the case of Egnozzi v. Egnozzi, supra the court refused to presume such impossibility from an interval of 301 days, holding that the fact should be established by competent medical proof. It is noted that the case was one in which the plaintiff husband sought a divorce based on his wife's alleged adultery. Proof of nonaccess for a period of 307 days was held, in Commonwealth v. Cicerchia, 177 Pa. Super. 170, 110 A.2d 776 (Super. Ct. 1955), to be sufficient to rebut the presumption of legitimacy. In Commonwealth v. Young, 163 Pa. Super. 279, 60 A.2d 831 (Super. Ct. 1948), the court found, in works on medical jurisprudence, references to protracted pregnancies of up to 334 days' duration, and in one medical text-book there was a statement that pregnancy *77 has been found to vary from 220 to 330 days, the average being 270 days. A period of 320 days, testified to by the complaining witness, was determined in Gillis v. State, 206 Wis. 150, 238 N.W. 804 (Wis. Sup. Ct. 1931) to be extremely rare and as establishing only a possibility of paternity. In re Mc Namara's Estate, 181 Cal. 82, 183 P. 552, 7 A.L.R. 313 (Sup. Ct. 1919), which also reviews medical reports on delayed births, points out that any period in excess of 300 days is exceptional. None of these cases cites an example of a pregnancy that lasted 350 days.
The presumption of legitimacy, strong as it is, does not require that the possibility of nonaccess be excluded to the point of absolute certainty. Our courts have spoken of "no possible escape" from the presumption. Elsewhere it is required that evidence of nonaccess be "clear and convincing," or "strong and irresistible," or "beyond all reasonable doubt". See In re Findlay, 253 N.Y. 1, 170 N.E. 471 (Ct. App. 1930). What is meant by these pronouncements, according to Findlay is that the presumption will not fall unless common sense and reason are outraged by a holding that it abides.
Mrs. Jackson candidly admits that decedent was not the father of her child, and there is no reason to disbelieve her. She is not motivated by self-interest, since one may infer with reason that if she could not have the insurance money, it is unlikely she would wish to deprive her son of it. Her testimony, coupled with the uncontroverted fact of nonaccess for a period of more than 11 months, can lead to no other conclusion than that decedent was not and could not have been the father of Ronald Odell Jackson.
Counsel for the infant defendant argues, however, that if Mrs. Jackson is barred from recovering the proceeds, her child is rightfully entitled to them through her. He overlooks the principle that, as constructive trustee, Mrs. Jackson holds title to the proceeds for the benefit the other next of kin of decedent, a category which does not include the child. It is further urged that acquiescence to parenthood by married adults bars and estops a later denial of parenthood, *78 but no cases are cited to support this proposition. Finally, the contention that Mrs. Beverly and Delmas L. Jackson have no standing to assert the illegitimacy of the infant defendant is without merit.
For the reasons stated, the court concludes that the infant defendant, Ronald Odell Jackson, is not entitled to the proceeds of the life insurance policy in question.
The parties have stipulated that Ellen C. Beverly is decedent's mother, that Delmas L. Jackson was his natural father, and that the two were never married. It is also stipulated that decedent had not been adopted by Delmas L. Jackson.
Since Mrs. Jackson is precluded from recovering the proceeds, title to which vests in her as constructive trustee for the benefit of decedent's other next of kin, and since Ronald Odell Jackson, being illegitimate, has no claim to decedent's estate, it necessarily follows that Mrs. Beverly, decedent's mother, is the next of kin who is entitled to the proceeds, subject only to the claim advanced by Delmas L. Jackson as decedent's natural father.
Although Jackson concedes that he cannot inherit from his illegitimate son because of N.J.S. 3A:4-7, he contends, nevertheless, that the right of inheritance is not involved and that he is entitled to share the proceeds as parent by virtue of the Servicemen's Group Life Insurance Act, supra. His position is that the word "parent" in the statute includes the natural father. There is no need to determine the meaning of the act insofar as this case is concerned. But see Gibbs v. United States, 80 F. Supp. 907 (E.D.N. Car. 1948); Howard v. United States, 2 F.2d 170 (E.D. Ky. 1924). A decedent's spouse is the person to whom the insurance proceeds are initially payable in the absence of a designated beneficiary, and decedent's parents are not entitled to the money unless there is no spouse or child. As has already been established, Mrs. Jackson has title to the proceeds, but she holds it as constructive trustee for the benefit of the other next of kin. The money goes to the one entitled *79 thereto under our statute of distribution; consequently, Delmas L. Jackson has no valid claim to it.
Judgment will be entered declaring that Stella Mae Jackson, Ronald Odell Jackson and Delmas L. Jackson are not entitled to and have no right in the insurance proceeds now on deposit with the clerk of the court, and that Ellen C. Beverly is entitled to the fund.