In the Matter of the Estate of JOHN FINDLAY, Deceased. ALFRED BROOKS, Appellant; WILLIAM FINDLAY et al., as Administrators, Respondents.

2

(Argued January 7, 1930; decided February 11, 1930.)

*Christian S. Lorentzen* for appellant. Error was committed either in admitting incompetent hearsay evidence on the question of parentage or, being admitted without or over objection, in considering it inconclusive, and invoking the rule of presumption. (*Horan* v. *Hastorf*, 223 N. Y. 490; *Reed* v. *McCord*, 160 N. Y. 330; *Hull* v. *Littauer*, 162 N. Y. 569; *Flora* v. *Carbeau*, 38 N. Y. 111; *Koester* v. *Rochester Candy Works*, 194 N. Y. 92; *Matter of Seabury*, 1 App. Div. 231; 153 N. Y. 443; *Banbury Peerage Case*, 1 Sim. & Stu. 153; *Morris* v. *Davis*, 5 Cl. & Fin. 463; *Burnaby* v. *Bailee*, 42 Ch. Div. 282; Schouler's Domestic Relations [5th ed.], § 225; 2 Kent's Com. 211; *Matter of Matthews*, 153 N. Y. 443; *Matter of Madura* v. *City of New York*, 238 N. Y. 214.) No presumption arose in favor of the respondent Findlay claiming through his mother who had left her lawful husband and contracted a bigamous marriage. (*O'Gara* v. *Eisenlord*, 38 N. Y. 296; *Minner* v. *Minner*, 238 N. Y. 534; *Machini* v. *Zanoni*, 5 Redf. 492; *Gall* v. *Gall*, 114 N. Y. 109; *Williams* v. *Williams*, 63 Wis. 58; *Matter of Richards*, 133 Cal. 524; *Olmstead* v. *Olmstead*, 190 N. Y. 458; 216 U. S. 386.) The proof of non-access was irrefragable. (*Thyll* v. *N. Y. Long Branch R. R. Co.*, 92 App. Div. 513.)

*James N. Gehrig, Jeremiah Wood* and *Ward Wilklow* for respondents. Appellant having failed to take proper exception to the decision of the Surrogate and the dismissal of the petition, the case is not one which is properly reviewable by the Court of Appeals. (Surr. Ct. Act, § 72; *Sugg* v. *Wandling*, 250 N. Y. 517; *People* v. *Davis*, 231 N. Y. 60; *Wangner* v. *Grimm*, 169 N. Y. 421; *Hopkins* v. *Clark*, 158 N. Y. 299; *City of Buffalo* v. *New York, L.*

*E. & W. R. R. Co.*, 152 N. Y. 276; *Matter of Sprague*, 125 N. Y. 732; *Matter of Kellogg*, 104 N. Y. 648; *Matter of Hood*, 104 N. Y. 103; *Angevine* v. *Jackson*, 103 N. Y. 470.) Where the legitimacy of a child is attacked, the burden is upon the person attacking the legitimacy of that child to prove that the mother and her husband had not access to each other during the period of conception, prior to the birth of the said child. (*Hynes* v. *McDermott*, 91 N. Y. 451; *Caujolle* v. *Ferrie*, 23 N. Y. 90; *Mayer* v. *Davis*, 122 App. Div. 393; *Matter of Barthel*, 111 Misc. Rep. 727; 192 App. Div. 926; *Coler* v. *McTighe*, 213 App. Div. 831; *Young* v. *Shulenberg*, 165 N. Y. 385; *Tracy* v. *Frey*, 95 App. Div. 579; *Reed* v. *McCord*, 160 N. Y. 330; *Aalholm* v. *People*, 211 N. Y. 406.) Where the legitimacy of a child is attacked, the law raises a presumption of a valid marriage between the parents of the child. (*Matter of Biersack*, 96 Misc. Rep. 161; 179 App. Div. 916; *Price* v. *Tompkins*, 108 Misc. Rep. 263; *Hutchins* v. *Kimmell*, 31 Mich. 130; *Peet* v. *Peet*, 52 Mich. 467; *Kopke* v. *People*, 43 Mich. 45; *Barber* v. *Valentine*, 125 Mich. 336; *Opdyke* v. *Opdyke*, 237 Mich. 417.)

CARDOZO, Ch. J. Alfred Brooks, a brother of the decedent, John Findlay, formerly Albert Brooks, brings this proceeding to revoke letters of administration granted to William Findlay and another upon the false suggestion as he claims that William was John's brother, and entitled as such to administer the estate.

Henry Brooks and Ann Aldridge were married in England in 1852. They had three children: Arthur, who died unmarried many years ago; Albert, the decedent, who came to America in 1874 at the age of nineteen and changed his name to John Findlay; and Alfred, the petitioner, born in 1859, and still a resident of England.

Ann Brooks (formerly Ann Aldridge), the mother, left her husband and children in 1864, and ran away with James Findlay. She came to America with her paramour,

though the date of their sailing is not precisely fixed. There is testimony by a surviving brother of Henry Brooks that it was shortly after the elopement. There is a trace of testimony for the respondent that might place it as late as 1875. Ann Brooks, or Ann Findlay as she was then known, had three children after her flight from Henry Brooks. One of these, Walter, now dead, was born in 1865 or at the latest 1867, was reared in the home of the Findlays, and through life was acknowledged as their son. The second, William, to whom letters have been issued, was born in September, 1875, was similarly reared and similarly acknowledged. The third and youngest, Percy, was born in the United States, and reared and acknowledged in the same way.

James and Ann Findlay on their arrival in America made their home for a season at Hamilton, Ontario, and then at Medina, New York, but soon drifted to Detroit, where they resided till they died. Albert Brooks, who had come to the United States in 1874, joined his mother in Detroit and made his home with her for a time, assuming the name of John Findlay. He left Detroit later, and went to Hempstead, Long Island, where he resided at his death. Alfred Brooks, the petitioner, paid a short visit to the United States in 1881 and found his mother and James Findlay living in Detroit with the children of the guilty union, or children so acknowledged. It was there that James died at a date not stated in the record. It was there that the mother died in March, 1900. She had never recrossed the seas except perhaps for a brief visit with James Findlay and the children at a time not clearly stated, but, it seems, about 1891. Meanwhile, during all the years since her elopement in 1864, her abandoned husband, Henry Brooks, had continuously remained in England where he died in March, 1906, at the age of seventy-nine. A search of the English records shows that his marriage to Ann Aldridge had never been dissolved.

The decedent, John Findlay, formerly Albert Brooks, died a widower, without issue and intestate at Hempstead, Long Island, in 1926. William Findlay, claiming to be a legitimate brother, applied to the Surrogate for letters of administration, and prayed that the respondent Wood be named as joint administrator, though there is no suggestion that Wood was of kin to the decedent. Letters were issued accordingly in January, 1927. About six months later Alfred Brooks, learning of the grant of letters, began this proceeding. He attacked the appointment of William Findlay as made upon a false suggestion of legitimate kinship. He attacked the appointment of the coadministrator, Findlay's nominee, upon the ground of an adverse interest. The Surrogate dismissed the petition on the merits. The evidence in his view was inadequate to overcome the presumption of legitimacy. William Findlay acknowledging himself continuously as the son of Ann Aldridge and James Findlay, and so acknowledged by them, was to be presumed, none the less, to be the son of Ann Aldridge and Henry Brooks, her abandoned husband. The Appellate Division unanimously affirmed.

We have said that William had continuously acknowledged himself as the son of Ann Aldridge and James Findlay, and was so acknowledged by them. He did not retract this acknowledgment when testifying here. Placed on the stand as a witness for the petitioner, and asked the blunt question, " What was your father's name? " he answered bluntly, " James Findlay." Cross-examined by his own counsel, he explained in effect that since his earliest infancy, he had been brought up in that belief. Upbringing and belief must yield, we are told, to the presumption of legitimacy. If Ann Brooks, who ran away with James Findlay in 1864, did not come to America till 1875, the year of William's birth, there is a bare possibility that she was visited by her abandoned husband while she was living away from him in adultery, and that

Walter and William and Percy, acknowledged by her and the adulterer as the fruit of the illicit union, were conceived at these clandestine meetings, unproven but presumed. Upon this possibility and no more, the decree in controversy rests. The presumption of legitimacy will not bear so great a strain.

Potent, indeed, the presumption is, one of the strongest and most persuasive known to the law (*Hynes* v. *McDermott*, 91 N. Y. 451, 459; *Matter of Matthews*, 153 N. Y. 443), and yet subject to the sway of reason. Time was, the books tell us, when its rank was even higher. If a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity. The presumption in such circumstances was said to be conclusive (*Cross* v. *Cross*, 3 Paige, 139; *Van Aernam* v. *Van Aernam*, 1 Barb. Ch. 375; Thayer, Preliminary Treatise on the Law of Evidence, p. 540; 5 Wigmore, Evidence, § 2527; Nicolas on Adulterine Bastardy, pp. 29, 30). The rule of the four seas was exploded by the judgment in *Pendrell* v. *Pendrell* (2 Strange, 925), decided in 1732. It was exploded, as GROSE, J., observed in a later case (*Rex* v. *Luffe*, 8 East, 193, 208; Nicolas, *supra*, pp. 164, 172) " on account of its absolute nonsense." Since then the presumption of legitimacy, like other presumptions, such as those of regularity and innocence, has been subject to be rebutted, though there have been varying statements of the cogency of the evidence sufficient to repel it. At times the cases seemed to say that any possibility of access, no matter how violently improbable, would leave the presumption active as against neutralizing proof (*Rex* v. *Luffe*, *supra*, per Lord ELLENBOROUGH; *Head* v. *Head*, 1 Sim. & Stu. 150). A formula so inexorable has yielded with the years to one more natural and supple. There are survivals here and there of the rule of olden days (cf. *Powell* v. *State*, 84 Ohio St. 165; *Bunel* v. *O'Day*, 125 Fed. Rep. 303, 317; *Patterson* v. *Gaines*,

6 How. [U. S.] 550, 589). By and large, none the less, the courts are generally agreed that countervailing evidence may shatter the presumption though the possibility of access is not susceptible of exclusion to the point of utter demonstration. Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities (*Head* v. *Head, supra*). They will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty. Some of the books tell us that to overcome the presumption, the evidence of non-access must be " clear and convincing " (*Hynes* v. *McDermott, supra; Hargrave* v. *Hargrave,* 9 Beav. 552; cf. *Caujolle* v. *Ferrié,* 23 N. Y. 90, 108, 139); others that it must lead to a conclusion that is " strong and irresistible " (*The Aylesford Peerage Case,* [L. R.] 11 App. Cas. 1, 17); others that it must be proof " beyond all reasonable doubt " (*Cross* v. *Cross, supra; Van Aernam* v. *Van Aernam, supra; Phillips* v. *Allen,* 2 Allen, 453; *Sullivan* v. *Kelly,* 3 Allen, 148; *Stegall* v. *Stegall,* 2 Brock. 256; Fed. Cas. No. 13,351 [MARSHALL, J.]; 33 Harv. L. Rev. 307). What is meant by these pronouncements, however differently phrased, is this and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides. If husband and wife are living together in the conjugal relation, legitimacy will be presumed though the wife has harbored an adulterer (*Hargrave* v. *Hargrave, supra; Bury* v. *Philpot,* 2 Mylne & Keen, 349). It may even be presumed though the spouses are living apart if there is a fair basis for the belief that at times they may have come together. Whether such a basis exists in any given instance is to be determined, however, in the light of experience and reason. The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false (cf. *Matter of Case,* 214 N. Y. 199, 204).

Illustration will be helpful to guide us to a choice.

The beginning of the modern tendency can be marked in *Goodright* v. *Saul* (4 Term Rep. [Durnford & East] 356 [1791]). The husband and the wife had separated, and a child born later had received a different name, and had been brought up by its mother while living with another man. The court held the presumption overcome, though there was a possibility of meetings between the separated spouses. The next case to be noted, *Morris* v. *Davies* (5 Cl. & F. 163, 255) is a judgment of the House of Lords. The mother was living in adultery when the child was born, its birth was concealed from the husband, it was baptized as a baseborn child, and was recognized by the wife's paramour as the child of their union. Again the holding was that the presumption had been rebutted, though again there was a possibility, however remote, that the spouses had come together. *Hawes* v. *Draeger* ([L. R.] 23 Ch. Div. 173) is another case where there was separation, with issue born thereafter, reared in the household of the paramour, and known by his name. Once more the presumption was held to have been shattered. *The Aylesford Peerage Case* ([L. R.] *supra*, pp. 17, 18), a judgment of the House of Lords, renews the discussion and brings the precedents together. The conclusion is in harmony with the judgments we have summarized (cf. *Burnaby* v. *Baillie*, [L. R.] 42 Ch. Div. 282; *Cope* v. *Cope*, 5 Car. & P. 604; *Cross* v. *Cross*, *supra;* *Wright* v. *Hicks*, 15 Ga. 160, 170, 171, per LUMPKIN, J.).

We think the case at hand is ruled by these decisions. To apply to the facts before us the presumption of legitimacy, we must find in the first place that Ann Brooks was still in England in 1874 or 1875. This is very doubtful. On the one side, there is testimony that she left shortly after her elopement in 1864. On the other, there is William's statement, so haltingly expressed as to be hardly more than a suggestion, that by family tradition he had been brought to America while a babe in the arms. If we assume in his favor that his mother may

be found on the strength of this statement to have been in England at his birth, other difficulties are left. There is no evidence that Henry Brooks was a man of perverted or indecent habits. He must have been this in shocking measure if he was continuing carnal commerce with his wife who had run away from his home and was living apart from him in unconcealed adultery. There is no evidence that Ann Brooks after her flight with James Findlay led a promiscuous or disordered life. On the contrary, the home that she established, so far as strangers could judge of it, was orderly and decent. There is thus at the outset a high degree of improbability in the hypothesis that covertly at intervals during a period of ten years she was lying with the husband whom she had abandoned for another. This improbability, standing alone, might conceivably be insufficient to break the force of the presumption (*Van Aernam* v. *Van Aernam, supra*, with which compare, however, *Cope* v. *Cope*, and *The Aylesford Peerage Case, supra*). It is reinforced by many others. The sons born to the mother after her desertion of her husband were recognized by the Findlays as their own and not another's. The eldest of the three, Walter, was a grown child of eight or ten when William came into the world. Each knew the other as his brother and the Findlays as his parents. Each was born into a family life maintained with all the signs of regularity and order. We presume a vileness and degradation so improbable as at least to border on extravagance when we infer without proof that the relation thus established, a relation of *de facto* marriage, was soiled by the disgrace of a clandestine connection between the separated spouses. The extravagance is more violent, it approaches an absurdity, when the presumption is upheld in the face of a lifetime of avowal by mother and paramour that the children, reared as their own, were their own in very truth. "When all the ends which the presumption of legitimacy is designed to conserve have been defeated

by sordid facts, the courts must deal with the situation in a common sense way" (per BURCH, J., in *Nolting* v. *Holt*, 113 Kan. 495). "Unless a case of this kind is to be dealt with otherwise than according to the ordinary rules of reason and probability, I think the burden of proof would be rather on those who might suggest that they did meet again than on those who suggest the contrary" (per SELBORNE, L. C., *The Aylesford Peerage Case, supra,* p. 14). There are breaths of human nature at which presumptions shrink and wither.

Much was said in the opinion of the Appellate Division as to the admission of testimony in violation of the rules that govern hearsay declarations in respect of pedigree. Whatever was received in that regard was without objection and exception, and must, therefore, be considered, whether competent or incompetent (*Flora* v. *Carbean,* 38 N. Y. 111, 113). The Appellate Division, conceding this, was of the opinion that the error was of such a nature as to diminish probative effect. The supposed error, as we view it, must be held to be unreal. There is nothing in the pedigree rule that would bar testimony by William Findlay to the effect that James Findlay was his father (*Comstock* v. *State,* 14 Neb. 204; 4 Chamberlayne, Evidence, § 2962). His statement was an admission against interest which, though it be only a conclusion, was at least evidence against the witness, apart from any question whether it was evidence in his favor. Again there is nothing in the pedigree rule that would bar the testimony of William as to declarations by his mother. The criticism is that there was an absence of independent evidence that the declarant was related to the one whose pedigree was in question (*Young* v. *Shulenberg,* 165 N. Y. 385, 388; *Aalholm* v. *People,* 211 N. Y. 406). But the fact that Ann was the mother was conceded by every one, including, of course, William, who built his case upon that basis. A closer question, untouched by the court below, is whether her declarations were received

in violation of the rule that neither spouse may testify that there was no access to the other (*Chamberlain* v. *People*, 23 N. Y. 85, 88; *Russell* v. *Russell*, [1924] App. Cas. 687; *Palmer* v. *Palmer*, 79 N. J. Eq. 496; *Matter of Taylor*, 9 Paige, 611, 616, 617; Wigmore, Evidence, vol. 4, § 2063; Stephen's Digest of Law of Evidence, art. 98). Admissions by the spouses out of court are on the same plane in this regard as testimony in court (Wigmore, *supra;* Stephen, *supra*). Even so, a distinction is drawn between declarations separate from conduct, avowals of bastardy in the nature of mere confessions, and declarations in the form of verbal acts, which characterize and color the family relation. There may be " acts and conduct " [of the one spouse or the other] " tending, as part of a series of *res gestœ*, to throw light upon and to lead to a just conclusion upon a question on which they would not directly be permitted to give evidence " (*The Aylesford Peerage Case, supra*, at p. 9; see, also, *The Poulett Peerage*, [1903] App. Cas. 395; *Jane's Estate*, 147 Penn. St. 527, 531, and cf. *Goodright* v. *Saul, Morris* v. *Davies, Hawes* v. *Draeger, supra*). What was said by Ann Findlay in the home life at Detroit was more than a mere confession. It was an act accompanying and explaining the care of the household and the upbringing of the children. What was said by the putative father and the brothers was aimed at the same ends.

Viewing the evidence before us in all its cumulative significance, we think it points with overwhelming force to one conclusion and one only. We have no thought to weaken the presumption of legitimacy by allowing its overthrow at the call of rumor or suspicion, or through inferences nicely poised. What we are now holding is in line with the historical development which has shorn the presumption of some of its follies and vagaries. Follies and vagaries by concession there have been. We have abandoned the " nonsense " of the rule of the four seas. We no longer adhere to Lord CAMPBELL's dictum (*Piers*

v. *Piers*, 13 Jurist, 569, 572) that a mulatto child born of a white mother must be ascribed to the white husband, and not to the black paramour, if the husband had access to his wife during the period of gestation (Thayer, *supra*, p. 346; *Bullock* v. *Knox*, 96 Ala. 195; *Rhyne* v. *Hoffman*, 59 N. C. 335). Extravagances hardly less violent there have been at other times in insisting upon the negation of every shadowy possibility. These and nothing more we are pruning from the law.

Another basis for the judgment suggested in the briefs of counsel must have a word of notice. The suggestion is put forward that there may have been a common-law marriage between James and Ann Findlay, and then to meet the objection that such a marriage would have been bigamous, the court is asked to presume that the earlier marriage, the one with Henry Brooks, was subject to some impediment, unknown and unproved, and may be disregarded now as void. In aid of a presumption that William is legitimate, there is to be an opposite presumption that the petitioner and the decedent, born of a ceremonial marriage, were, each of them, illegitimate. This is the presumption of legitimacy gone mad. It is with the clash of like presumptions as it is with the conflict of estoppels. " The bringing forward of unusual facts * *. * discharges the whole matter from the operation of presumptions, and like Coke's estoppel against estoppel ' doth put the matter at large ' " (Thayer, Preliminary Treatise on Evidence, p. 351).

A word must be said also as to the coadministrator, Mr. Wood. There is no basis for a finding that he is disqualified by any adverse interest. He was appointed, however, at the request of William Findlay (Surr. Ct. Act, § 118) and can have no better title. The petitioner being a non-resident alien is incompetent to serve (Surr. Ct. Act, § 94). In default of other next of kin, administration must be granted to the public administrator, if there is one, or if none, to the treasurer of the county

(Surr. Ct. Act, § 118). Only if these refuse or are incompetent, does the appointment go to others.

There remains for final consideration a question of practice. The respondents insist that the appeal is ineffective to bring up anything for review, and this upon the ground that there was an omission by the appellant to file an exception to the Surrogate's decision. The Surrogate did not make any separate findings of fact and conclusions of law. If he had, exceptions to the findings would unquestionably have been necessary to present a question here. Instead he filed a decision in the form of an opinion denying revocation of the letters previously granted. A decree dismissing the petition on the merits was subsequently entered.

Surrogate's Court Act (§§ 71 and 72) provides as follows:

" § 71. Decision by surrogate after trial without a jury. Upon a trial before the surrogate without a jury, the surrogate must file in his office his decision in writing which shall direct the decree to be entered, which, except for such direction, need not contain either the facts found or the conclusions of law. No party shall have the right, after the close of the trial, to request a finding upon any question of fact or a ruling upon a question of law. For the purposes of appeal or other form of review, the decree made by the surrogate upon the trial by him of an issue of fact shall have the same effect as the general verdict of a jury would have if the same issues were triable before a court and a jury and were so tried and a general verdict rendered thereon.

" § 72. Exceptions upon a trial. An exception may be taken to a ruling by a surrogate upon the trial by him of an issue of fact, in a case where such an exception may be taken to a ruling of the supreme court upon a trial of a civil action without a jury, of an issue of fact. The provisions of law relating to the manner and effect of taking such an exception, and the settlement of a case containing the exceptions, apply to such a trial before

a surrogate; for which purpose, the decree is regarded as a judgment, and notice of an exception may be filed in the surrogate's office."

Referring to the Civil Practice Act for the practice in the Supreme Court, we find the following regulations as to the taking of exceptions:

" § 444. Exception to ruling on question of law.

" 1. An exception may be taken to the ruling of the court or of a referee, upon a question of law, arising upon the trial of an issue of fact.

" 2. An exception, other than an exception to a determination of a challenge to a juror or to a panel or array of jurors, cannot be. taken to a ruling upon a question of fact.

" 3. For the purposes of this article, a trial by a jury is regarded as continuing until the jury is discharged.

" 4. Upon the trial of an issue of fact by a referee or by a court without a jury, a finding of fact without any evidence tending to sustain it, is a ruling upon a question of law within the meaning of this section.

" § 445. Exceptions after close of trial by court or referee. Where an issue of fact is tried by a referee, or by the court, without a jury, an exception to a ruling, upon a question of law, made after the cause is finally submitted, must be taken by filing a notice of the exception in the clerk's office and serving a copy thereof upon the attorney for the adverse party. The exception may be so taken at any time before the expiration of ten days after service upon the attorney for the exceptant of a copy of the decision of the court or report of the referee and a written notice of the entry of judgment thereupon. If the notice of exception is filed before the entry of final judgment, it must be inserted in the judgment-roll; if afterwards, it must be annexed to the judgment-roll. In either case, it constitutes a part of the papers upon which an appeal from the judgment must be heard."

There is no procedure in the Supreme Court whereby a

judge, sitting without a jury and without directing a verdict, may render a decision on the merits except in the form of findings. That being so, there is no provision of the statute whereby the filing of an exception to such a decision is required. An exception is prescribed where the decision is one of nonsuit (*People* v. *Journal Co.*, 213 N. Y. 1), though the omission may be waived either expressly or by silence (*People* v. *Journal Co., supra; Termini* v. *Huth,* 191 App. Div. 218). The decree now before us is an adjudication on the merits. We are not prepared to extend by dubious analogy a requirement of practice so obviously futile. Where findings are separately stated, an exception has a value, even if a slight one, since it is a warning to court and counsel of the findings that are challenged (*Angevine* v. *Jackson,* 103 N. Y. 470, 471). No such function is fulfilled where there is a general decision, equivalent, as the statute says (Surr. Ct. Act, § 71), to the verdict of a jury. In such a case there is nothing to be gleaned from an exception beyond what there would be without it in the notice of appeal. The exception, if filed, is a meaningless formality. " It indicates no specific error; it directs attention to no finding, and leaves court and counsel in the dark as to the precise cause of complaint " (*Angevine* v. *Jackson, supra*). The statute must be specific before a meaningless formality will be exalted to the rank of an indispensable condition.

An examination of other records upon the files of the court reinforces this conclusion. At times, the appellant, reviewing a ruling of a Surrogate, has filed an exception to a general decision, and at other times, not. We have entertained the appeals in spite of the omission, though without considering the question, for not until the present case has it been brought to our attention. None the less, the uncertainty of the statute is reflected and exemplified in the incoherence of the precedents and the looseness of the practice. Extension by analogy becomes the less

admissible when diversity of construction is so strikingly attested.

The order of the Appellate Division and the decree of the Surrogate's Court should be reversed, with costs in the Appellate Division and in this court, and the proceeding remitted to the Surrogate's Court for the entry of a decree in accordance with this opinion.

POUND, CRANE, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Ordered accordingly.