Isidobb Levine, J.
Petitioner herein, a married womah at the time, hut separated from her husband, with whom she had a child Tara born July 14, 1969, as evidenced by written separation agreement dated March 23, 1972, gave birth to another child named Diane on August 21, 1973 and seeks a declaration in this proceeding that the respondent is the father of this second child.
In support of her petition petitioner produced the secretary of the obstetrician who had cared for her during her pregnancy and delivery. This witness produced the records of the dates of the visits to the doctor by petitioner, the charge made for the doctor’s services and the payments made on account. She testified that the respondent accompanied petitioner to the doctor’s office 'Once or twice, and on one occasion had been introduced to the doctor. Further, the witness stated that petitioner never came to the doctor’s office with any other male.
Respondent himself did not take the stand and the court recognizes that he is not compelled to testify (Family Ct. Act, § 531) and that no inference may be drawn from such failure to testify. (People v. Jones, 101 N. Y. S. 2d 317.)
Petitioner testified that she met the respondent for the first time at work in August or September, 1971. On January 1, 1972 the respondent came to petitioner’s apartment and their first act of sexual intercourse took place there.
*1007 Thereafter petitioner 'and respondent had sexual intercourse two or three times a week at petitioner’s apartment. On these occasions petitioner’s first child Tara stayed with petitioner’s mother overnight. Petitioner testified to having sexual intercourse with respondent on November 14,1972 in her apartment. It was on this night that petitioner claimed she conceived.
Petitioner testified that neither ,she nor respondent ever used contraceptives.
Petitioner described respondent’s body as having a scar on his chest, a mole on his left hip, and a protruding bone at the base of his spine. She did not recall any marks on his back.
Petitioner testified that when she missed her menstrual period at the end of November, 1972, she informed respondent. She confirmed her pregnancy in December, 1972 by seeing a Dr. Koopert, who was suggested by the respondent. Respondent’s reply was not to worry and that they would talk about it.
Thereafter petitioner claimed she went to Dr. Koopert when she began to bleed on December 3, 1972. He told her to go to Bernadette Falk Hospital, where she was taken by respondent, and where Dr. Koopert told her in respondent’s presence that she might be having an ectopic pregnancy and that she could miscarry, following which respondent took her home.
Thereafter petitioner saw the doctor every month in the company of respondent, until August 20, 1973 when she gave birth to Diane at Bernadette Falk Hospital. She was driven home from the hospital by the respondent three days later.
Petitioner claims respondent paid the hospital bill by giving her the money in cash (consisting of four bills from Bernadette Falk Hospital, dated as follows: May 19, 1973 — $100; June 15,1973 — $100; Aug. 21,1973 —$5; Aug. 22, 1973 —$340, tying in with bank money order of petitioner to Bernadette Falk Hospital for $100 dated June 9,1973).
Petitioner testified that she also paid the doctor’s bill from cash received by her from respondent (consisting of two receipts from Drs. Malaket and Koopert as follows: April 3,1973 — $100; July 12,1973 — $100; see, also, payment card of said doctors).
Petitioner testified that after her return from the hospital on August 23, 1973 she selected a baby carriage from Gertz’s Department Store, and gave respondent a card to see a particular sales person at the store who would advise him of the carriage selected (consisting of the sales person’s card and the purchase slip made out to the respondent for the purchase of the carriage on Aug. 30, 1973, just one week subsequent to the birth *1008 of the baby). (Italics, as well as all subsequent italics, is the c'ourf'S for emphasis.)
The petitioner testified that after the birth of the child respondent visited her until March 19, 1974, even while this case was pending, except for the period from November 16, 1978 to January 17, 1974. On January 17, 1974 the respondent telephoned her at 3:30 a.m., while drunk, and told her that he was sorry he had denied the baby and admitted that it is his child. He was still drunk at 4:00 a.m, when he came over and said he loved the baby and begged her forgiveness. He thereafter fell asleep on the couch with his coat on. The following morning at about 11:00 a.m., when sober, he repeated to petitioner what he had said the night before regarding the baby. He also gave petitioner $100. Thereafter respondent stayed in her home for one week during which time they continued to have sexual relations. He helped with the baby and gave petitioner money to go shopping.
Petitioner further alleged that on March 19, 1974, the last time she saw the respondent, he stayed overnight, and told her that he wanted to give her $35 per week for the baby and that he had lied to his attorney. She further stated that since respondent left her home on March 20, 1974, she has not seen him, but that he telepehoned her three times before the date of the commencement of this trial and stated that he could not afford $35 per week, and wanted to pay less. Petitioner claims she answered that she wanted more money.
Additional documentation submitted by petitioner includes: a photograph of respondent with her first child, Tara (not the child in question herein, namely Diane), showing respondent relaxing on the sofa with Tara in petitioner’s home; three greeting cards one red, one white and one blue, addressed to petitioner by respondent (one signed “love”) together with a business card of respondent with his signature thereon; a photocopy of a cashier’s check for $110.04 dated October 24,1973 payable to petitioner and enclosed in an envelope addressed by respondent to petitioner, in the alleged handwriting of the respondent.
In addition to said check, petitioner claimed that respondent had given her on the following dates since the birth of the baby the monetary sums of: (a) January 17,1974 — $100; (b) following week — $50; (c) February 19,1974 — $60; (d) week after— $100 during the time respondent lived in petitioner’s house.
*1009 In addition petitioner introduced into evidence various articles of clothing which respondent left in her apartment, some of which she testified had been there since the fall of 1972.
Petitioner’s Exhibit No. 14 is the written separation agreement between petitioner and her husband, dated March 22,1972. It shows that the address of her husband is Bartaley, New York (petitioner testified her husband lived in Peekskill, New York), that the parties had separated and were living apart prior to March 22,1972, that petitioner was given custody of child Tara and that the husband was given the right to visit the child every Saturday from 10:00 a.m. to 8:00 p.m. During visitation the husband was permitted to take the child out of the house for exercise and. companionship. Petitioner testified that her husband never came into her apartment when he called for the child, usually on a Saturday or Sunday, but picked up the child on the sidewalk outside her apartment house when he pulled up in his car, at a prearranged hour. If there were no prearranged time for return he would call to say when he was returning the child, and petitioner would be waiting for him downstairs as his car pulled up.
Petitioner’s Exhibit No. 15 is the decision and judgment of divorce obtained by petitioner’s husband against her in ¡Supreme Court, Westchester County on January 24,1974, which was about five months after the birth of Diane.
Finally, in support of petitioner’s claim that she was not living with her husband during the critical period herein, petitioner offered in evidence her apartment lease at 21-60 123rd Street, Jamaica, New York, dated August 3, 1971, which shows her name alone as tenant.
Another witness for petitioner was Carla Yon Proot, a social worker for the Department of Social Services of the City of New York. She stated that she met both petitioner and respondent together at petitioner’s home on May 30, 1973 during working hours. She stated that while respondent specifically told her that he would not acknowledge paternity verbally or in writing he was concerned with how. much one would have to pay to support the child, and that he brought this subject up continually. The written case record of the Department of Social Services was marked in evidence. The witness testified that respondent told her that he would pay for petitioner’s medical expense, even though she conceded that she had left this out of the record. The remainder of the social worker’s testimony dealt with the concern of petitioner that her *1010 husband might find out about her pregnancy since she might lose custody of Tara, and that respondent remarked that he was not sure the baby was his. The final witness for petitioner was her mother, who corroborated the petitioner in many aspects of her testimony. She said she first met respondent in her" daughter’s home in January, 1972, and saw him on numerous occasions thereafter. Specifically she testified she brought Tara back to petitioner’s apartment one time in June or July, 1972, when she saw respondent in the bathroom. He .had no shirt, shoes or socks on at the time. Significantly she testified that in early November, 1972 she took Tara home to petitioner’s apartment somewhere between 7:30 and 7:45 a.m. and saw respondent in petitioner’s bed. He was sound asleep. Petitioner was awake and had let her into the apartment.
She testified that she spoke to respondent in March, 1973, at which time her daughter was pregnant, and respondent told her he loved petitioner and would like to marry her because of the baby, but he considered himself too old to get married.
She further testified that she knew her former son-in-law, and that he returned Tara to her home when he visited her about once a month; that she never saw him in petitioner’s home after petitioner moved out of their marital home to her own apartment (August 2, 1971); that on one occasion in 1972 he picked up Tara at her house; that petitioner and her former husband did not get along; that her daughter did not date anyone else while she was seeing the respondent; that she knows Detective Differs, who took petitioner out socially only once, and that she never saw him in petitioner’s apartment; that while her daughter stayed with her from February, 1971 to August, 1971 her former son-in-law came down to see Tara about once in three months, a total of two times during said period, and that he would pick up the child and return her to the vestibule outside her front door.
Respondent did not take the stand. His attorney recalled as his witness the social worker who originally testified on behalf of petitioner. She" confirmed petitioner’s concern that her husband might find out about her pregnancy. She did not recall ever saying that petitioner’s husband came into petitioner’s apartment, and that there was no involvement with petitioner’s husband during any of her conversations with petitioner.
Finally respondent produced petitioner’s former husband, who corroborated petitioner’s testimony in practically every significant detail. He confirmed that he lived and still lives in Southley Junction, New York; he picked up child Tara on *1011 visitation days pursuant to the separation agreement executed in March, 1972; he never entered petitioner’s apartment, always picking up Tara outside the apartment door; he has seen the wall in the apartment and some kind of carpeting on the floor when the door was opened, and could not see beyond the wall; he saw Tara about 10 times a year; he did not remember whether he exercised his visitation rights at Thanksgiving, 1972, although admitting that it is possible that he might have seen her on Thanksgiving or Christmas, 1972; he was always in a hurry to get downstairs back to his car since it was difficult to get a parking spot in front of petitioner’s home and he was usually parked illegally; he only saw the name Colmand on the bell downstairs; he always telephoned before he called on Tara on a Saturday or Sunday, and accordingly the child was usually ready to be picked up the moment he arrived at the apartment door; he never visited the child in petitioner’s apart- • ment; he never was with petitioner in a bar or took her out anywhere since their separation.
On cross-examination the former husband categorically denied ever having sexual intercourse with petitioner on any occasion from the date of the execution of the separation agreement in March, 1972, to the present date. He did not remember if he saw petitioner at all from November, 1972 to March, 1973, never saw her pregnant, and never knew about her pregnancy until he received the subpoena on behalf of respondent.
The issue presented to this court is whether the petitioner has sustained her burden of proof of establishing that the respondent is the father of her child Diane bom on August 21,1973.
Initially the court would like to state that it has had the opportunity of seeing, hearing and evaluating the witnesses and their testimony, and is deeply and genuinely impressed with petitioner and her witnesses and with the testimony of petitioner’s husband, and finds their testimony fully and wholly credible.
The principle of law to be applied has oft been repeated, and at first glance has an aura of clarity, namely that petitioner must prove her case by clear and convincing evidence, which is entirely satisfactory so as to warrant the genuine conclusion that the respondent and no one else is the father of the child involved. (See Matter of Gray v. Rose, 30 A D 2d 138; Matter of Black v. Brown, 27 A D 2d 683; Matter of Commissioner of Welfare of City of N. T. v. Carone, 34 A D 2d 521; People v. Lewis, 25 A D 2d 567; Matter of Lee v. Stix 55 Misc 2d 940; and Matter of Mannain v. Lay, 33 A D 2d 1024, affd. 27 N Y 2d 690; *1012 Matter of Hawthorne v. De Both, 42 A D 2d 827; and Matter of Iris “ GG ” v. Thomas “ HH ”, 37 A D 2d 1006.)
While in all of the above cases except Matter of Iris “ GG ” v. Thomas “ HH ” (supra), the court found that the presumption of legitimacy had not been overcome, since they found that the record did not negate access by the husband, all citing Matter of Findlay (253 1ST. Y. 1), nowhere does any court spell out precisely what constitutes access.
In Matter of Findlay (supra, p. 8) we find the language “ that the presumption will not fail unless common sense and reason are outraged by a holding* that it abides * * * It may even be presumed though the spouses are living apart if there is a fair basis for the belief that at times they may have come together.” (Italics supplied.)
But what constitutes “ coming together ”? Does it mean that access is found and the presumption not negated when the husband is found to be in the United States (only five hours away from any point by plane) or if the husband is found in the State of New York ?, the City of New York ?, the same borough ?, a few blocks away ?, the apartment lobby where the wife resided during the critical period in her very apartment or home at the time, or actually in her bed at that time ?.
Or is this elusive issue one which is to be resolved on all the evidence in the record, as a finding of fact, and not as an issue of law based on specific facts or some similar circumstances that would outrage common sense and reason if the presumption were not indulged; or the converse, where the respondent was found in bed with the petitioner during the critical period, and the husband was impotent and incarcerated during said period, in which event it would be held as a matter of law that the presumption of legitimacy was negated since to uphold such presumption would defy common sense and reason? — and would all cases in between these extremes be resolved as question of fact for the trial court? This court concludes that the latter is the rule to be followed in the case at bar based upon the specific facts herein.
An examination of some of the leading reported cases should fortify the rule of law herein before set down by the court.
In the oft-cited case of Matter of Gray v. Rose (30 A D 2d 138 supra), the Appellate Division of the Third Department reversed an order of filiation of the Family Court of Delaware County, on testimony of petitioner that during the critical period she met her husband at a bar, once in her apartment to see the child and upon testimony of another witness that he found petitioner *1013 and her husband in his barbershop on a day when his store was closed, and they were together and unclad in a room back of his shop, where he permitted the husband to sleep. This same witness testified further that he had seen petitioner at night with male companions whom he named, and respondent testified to the same effect, stating that her husband was with her on one of the occasions. Petitioner did not testify in rebuttal, either to contradict this testimony or to otherwise comment upon the evidence with respect to her presence in the barbershop.
In reversing the finding of paternity, the court stated ‘ ‘ the record contains no decision whatsoever and thus fails to disclose the basis for the order of filiation appealed from”. (Id., p. 140.)
It becomes apparent, therefore, that the reversal was not based upon the mere testimony of actual access by the husband, or the proximity of petitioner to her husband at a bar or in her apartment, but rather upon the lack of quality of this testimony by petitioner and the failure of the record to contain any decision whatsoever and to disclose the basis for the order of filiation appealed from.
The court (p. 141) further cited Matter of Black v. Brown (27 A D 2d 683, supra), stating that “In a somewhat similar factual situation we found that ‘ the record [did] not negate access and petitioner’s testimony [did] not constitute clear and convincing proof of appellant’s responsibility.’ ” (Italics supplied.)
In the case at bar this court has attributed great veracity to the testimony of petitioner and her witnesses and the ex-husband of petitioner and has found them to be entirely credible and worthy of belief, notwithstanding any motivation such witnesses would naturally have.
Further examining the decision itself in the case of Matter of Black v. Brown (27 A D 2d 683, supra) we find that “ the only testimony in this case bearing on sexual relations comes from the petitioner who is a married woman.” Her husband “ continued to reside within á few blocks of her and as of the apparent time of conception she often saw him on the streets in the city where they resided. There had been no contractual or court order of separation, but she denied any sexual relations with her husband since March of 1963. * * * The respondent did not take the stand.”
Tn reversing the order of filiation the Appellate Division stated (p. 683): “ The record does not negate acóess cúnd peti *1014 tioner’s testimony does not constitute clear and convicing proof of appellant’s responsibility.” (Italics supplied.)
Thus we note again that the appellate court reversed because of the record and lack of clear and convincing proof of respondent’s responsibility. In the case at bar this court is fully convinced by clear and convincing and entirely satisfactory evidence offered by petitioner and her witness and the testimony of petitioner's ex-husband, of the respondent’s paternity of the child. In passing it will be further noted that the only testimony bearing on sexual relations in the case of Matter of Black v. Brown came solely from the petitioner whereas petitioner’s testimony in the ease at bar was fortified by the additional testimony and her mother, her former husband, and a social worker, all of which related directly to the issue of paternity. In passing, since the court in the Black case referred to the lack of a contractual or court order of separation, it should be noted that in the instant case petitioner and her husband had signed a formal written separation agreement.
See, also, Matter of Commissioner of Welfare of City of N. Y. v. Carone (34 A D 2d 521, supra), where again the petitioner was a married woman who was separated from her husband. The court stated therein: * * She testified as t'o nonaccess at the times of the impregnations sought to be charged to respondent but the record is not clear as to the whereabouts of the husband at such times. The husband was not called as a witness. ‘ The possibility of access by her husband was an issue required to be determined by the trial court. (See Moy Mee Soo v. Leong Yook Yick, 21 A D 2d 45; Matter of Findlay, 253 N. Y. 1.)’ (Matter of Harris v. Doley, 22 A D 2d 769.) Furthermore, on the record as a whole, the evidence bearing on the issue of each paternity is not entirely satisfactory. The trial court was required to resolve conflicts in the evidence and resolve issues of credibility but it failed to comply with its responsibility to state the essential facts which constituted the basis for its determination.” (Italics supplied.)
Here again, we find the reversal by the Appellate Division bottomed upon the lack of clarity in the record with respect to access by the husband which11 ‘ was an issue required to be determined by the trial court' ”; which further indicates that it is the trier of the facts who must determine the issue of access upon the entire record and that no single fact of proximity is alone controlling.
With respect to the case of People v. Lewis (25 A D 2d 567, supra) we find, the Appellate Division of the Second Department *1015 reversing an order of filiation in Suffolk County, by reason of the testimony of the petitioner with respect to some bizarre and unusual physical incapacity on the part of her husband which the court would not accept without corroboration.
In the case at bar the testimony offered by petitioner was not bizarre or unusual and was corroborated in various important and critical aspects by several witnesses.
In the case of Matter of Lee v. Stix (55 Misc 2d 940, supra) where the court found that petitioner was an adulteress and that she failed to rebut the presumption of legitimacy, citing Matter of Findlay (253 N. Y. 1, supra), since her husband was potent and access by respondent was shown by evidence that both spouses lived in the same dwelling during petitioner’s four years of relationship with respondent. The court said the spouses’ uncorroborated testimony as to nonaccess under the circumstances of this record does not negate access by the husband, and her petition is dismissed.
Here again we find the basis for reversal, namely the uncorroborated testimony and the nature of the record therein.
In the case of Matter of Martin v. Lane (57 Misc 2d 4), reversed by the Appellate Division, Second Department in Matter of Mannain v. Lay (33 A D 2d 1024, supra), in a three to two decision and then unanimously affirmed by the Court of Appeals, without opinion (27 N Y 2d 690), we find an order of filiation by the Family Court in Dutchess County reversed and dismissed on the ground that 11 while the proof was sufficient to establish a meretricious relationship between petitioner and appellant, in our opinion it fell far short of overcoming the presumption of legitimacy by failing to negate access on the part of petitioner’s husband during the period when conception must have occurred (Matter of Gray v. Rose, 32 A D 2d 994; Matter of Black v. Brown, 27 A D 2d 683; People v. Lewis, 25 A D 2d 567; Matter of Lee v. Stix, supra). In the circumstances, petitioner failed to sustain her burden of proving appellant’s responsibility by evidence so clear and convincing as to be entirely satisfactory.”
The facts in the Mannain case show that after petitioner and her husband had four children, the couple separated and she became intimate with the other man, had sexual relations with him during June, July and August, 1965 and gave birth to the child in question on March 28, 1966. By that time she and her husband had been separated for over three years. Her husband too, testified to nonaccess and that he visited her at her home on three or four occasions but only to see the children.
*1016 The Appellate Division majority in reversing the order of filiation and the Court of Appeals in unanimously affirming the dismissal, found that the proof fell far short of overcoming the presumption of legitimacy by failing to negate access, and in the circumstances petitioner failed to sustain her burden of proving appellant’s responsibility by evidence so clear and convincing as to be entirely satisfactory.
However, it should be noted that the petitioner had had four children by her husband, and that although separated from her for three years, he had visited her at her home on three or four occasions to see the children. In the case at bar the testimony of the petitioner and her former husband differs from that in the Mannain case in that her husband never entered her home when he visited their child Tara. In that regard petitioner was supported by her mother’s testimony to the extent that petitioner’s husband never even entered her apartment when he returned the child, and further that petitioner and her husband were not on good terms with one another, both before and after their execution of a written separation agreement. This testimony is fully credited by this court, which has made its finding of paternity based on all of the petitioner’s testimony and upon the entire record, including the testimony of petitioner’s husband all of which it finds credible, and clear and convincing and entirely satisfactory, warranting the conclusion that the respondent and no one else is the father of child Diane herein.
Another case in which a finding of paternity was reversed because proof with respect to access was not clearly and convincingly negated by the petitioner (it appearing that the husband continued to be a resident of the same community as petitioner) is Matter of Hawthorne v. De Roth (42 A D 2d 827, supra), where the Appellate Division, Fourth Department, predicated its reversal on the fact that (p. 828) 11 petitioner’s testimony was not corroborated nor was any other witness produced by her ”. The court further stated (p. 828) that “ the record contains no finding with respect to the proof before the trial court and \thus fails to disclose the basis upon which it based its order. Filiation proceedings require adequate findings (Family Ct. Act, § 165; CPLR 4218, subd. [b]) * * * In our view, justice will be better served for petitioner and appellant by a new trial where petitioner may present corroboration both with regard to nonaccess by her husband and that she was with respondent near the time of conception; and where -appel *1017 lant may defend this charge with the assistance of counsel, if he is so advised.” (Italics supplied.)
A recent case in which a finding of paternity was affirmed by the Appellate Division, Third Department, is Matter of Iris “ GG ” v. Thomas “ HH ” (37 A D 2d 1006, 1007, supra) where the court held that ‘ ‘ Although the presumption of legitimacy is one of the strongest known to the law and may be presumed even though the spouses are living apart if there is a fair basis for the belief that at times they may have come together, still it is subject to rebuttal. (Commissioner of Public Welfare v. Koehler, 284 N. Y. 260, 263; Matter of Findlay, 253 N. Y. 1, 7). However, the fact that respondent was a married woman * * * does not bar this paternity suit (Matter of Mannain v. Lay, 33 A D 2d 1024, affd. 27 N Y 2d 690). Recognizing that the burden cast upon petitioner was substantial and that the evidence of paternity had to be m!ore than preponderant and had ,to convince to the point of entire satisfaction (Matter of Gray v. Rose, 32 A D 2d 994, respondent fulfilled that burden by proving, convincingly and clearly, recurrent acts of intercourse during the critical period and negated access with her husband ,by proof that she did not cohabit with him for 26 months prior to the birth and that she had no intercourse with him in 1969.” (Note this was her testimony, which the court credited, despite further testimony that the husband came to see his daughter born in 1965, in October, 1969, but appellant ivas at the house the day he came.)
The court further stated (p. 1007) u Her .version was not shaken one iota, her testimony was undisputed and her contentions were found satisfactory by an eosperienced Family Court-Judge who was in a better position to evaluate credibility (cf. Matter of Commissioner of Welfare of County of Schoharie v. ‘Black’, 25 A D 2d 596; People v. Kelly, 20 A D 2d 740).” (Italics supplied.)
So too in the case at bar. This court has evaluated petitioner’s testimony as well as that of her witnesses and that of her former husband and has found same to be unshaken -and undisputed, and accordingly has fully credited same, so as to clearly and convincingly and with entire satisfaction established as a finding of fact that the presumption of access has been entirely rebutted, notwithstanding the initial presumption of legitimacy if there is a fair basis for the belief that at times petitioner and her former husband may have come together on those few occasions when he may have visited child Tara, if at all, during the Critical period, so that the court now feels fully warranted in reach *1018 ing the genuine conclusion that respondent and no one else is the father of child Diane herein.
Order of filiation directed accordingly.
With respect to the issue of the amount of .support to he ordered for the child Diane, as well as petitioner’s attorney’s application for counsel fees, these issues are set down for hearing before me at Part III of this court on September 20, 1974, unless earlier advanced by the court, if reassigned to Queens County prior thereto, in which event notice will be given to the attorneys.