James **GLOVER**, Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. CV–86–0191.

United States District Court,
E.D. New York.

March 13, 1989.

Andrew J. Maloney, U.S. Atty. E.D.N.Y. (Robert L. Begleiter, Brooklyn, N.Y., and Joseph D. McCann, Merrick, N.Y., Asst. U.S. Attys., of counsel), for U.S.

MEMORANDUM AND ORDER

GLASSER, District Judge:

The plaintiff seeks compensation for the injuries he allegedly sustained as a result of medical malpractice which occurred on or about July 29, 1983 at the Veterans Administration (VA) Medical Center in Northport, New York. The government concedes the medical malpractice. The only issue before the court for determination is the extent of the harm caused to the plaintiff by that malpractice and the just and reasonable sum of money which would compensate for such harm. The plaintiff makes no claim for lost wages or for past medical expenses, home care or rehabilitation.

Mr. Glover was fifty years old at the time of the malpractice and as a result of it suffered spastic paraplegia and the loss of bladder and bowel control. Mr. Glover also required a period of rehabilitation therapy. It is essential to any determination of damages that Mr. Glover's physical condition prior to July 29, 1983 be clearly understood. A brief description of that condition, based upon the exhibits and the portions of the testimony the court found credible, follows:

Mr. Glover himself testified to an assortment of physical ailments with which he was afflicted prior to 1983. He acknowledged that he suffered from asthma since birth and was taking medication for that disease. He acknowledged having high blood pressure; the removal of his gallbladder; the removal of part of his colon; the amputation of two toes; diabetes for which he was taking insulin since approximately 1977. Mr. Glover professed ignorance as to whether or not he suffered from poor circulation and the loss of sensation in his lower limbs. Mr. Glover also acknowledged receiving a seventy percent medical disability from the Veterans Administration in 1977 and receiving disability benefits from the Social Security Adminis-

tration in 1978 because of his inability to work.

A more detailed chronology of Mr. Glover's illnesses will be useful in the resolution of a significant claim of damage entitlement advanced by him, namely whether the paraplegia aggravated pre-existing illnesses or had any causal connection with the disabilities he now claims. Mr. Glover was afflicted with insulin-dependent diabetes as early as 1970–71. (Tr. 70–71, 160, 261). In 1973 he was hospitalized because his diabetes was out of control. (Tr. 162, 261). In 1976 he was found to be suffering from hypertension to a significant degree. (Tr. 261 et seq.).

In 1977, the records of the VA in Durham, N.C. reveal that he was admitted for diabetes and peripheral vascular disease. (Tr. 272). The latter disease had so adversely affected his sensation in the lower extremities that he was not aware of having stepped on a nail which became embedded in his foot until some time later when he noticed a bloodied sock. He also suffered from osteomyelitis, hypertension and obesity resulting in a finding that he was disabled for an indefinite period.

In 1979, the Durham VA hospital records reveal his admission for diabetes, significant neuropathy, retinopathy, foot ulcer and diabetes. (Tr. 165–169). Between 1977–1980 he visited the VA forty to fifty times for headaches, osteomyelitis, hypertension, diabetes, bronchitis and asthma. (Tr. 176).

In 1980 the records of the VA hospital in Northport, New York reveal diabetic gangrene and infection of the left great toe. (Tr. 174). Not long thereafter, the first and third toes of his left foot were amputated. (Tr. 179). In 1981, he was admitted on an emergency basis to Southside Hospital suffering from intestinal colic, hypertension, diabetes and osteomyelitis. (Tr. 177–78).

In 1982 his gallbladder and appendix were removed and from September 1–4, 1982 he was in the Southside Hospital suffering from asthma, hypertension, adult onset of diabetes and renal insufficiency. (Tr. 179, 247). From March 22–25, 1983 he was again a patient at Southside Hospital with hypertension, peripheral neuropathy and, as has been indicated his toes were amputated. (Tr. 179). It is significant to note that all of the foregoing ailments afflicted the defendant long before the malpractice which gave rise to this litigation. The plaintiff acknowledged the factual accuracy of the foregoing. (Tr. Oct. 21, 1988. 40 et seq.).

Perhaps the most pernicious aspect of personal injury litigation is the readiness with which "expert" witnesses render opinions on matters on which they have no competence and the readiness with which lawyers who call them elicit those opinions with knowledge that they aren't competent to render them. Both have been almost dramatically demonstrated in this case. I have had occasion to observe before that when expert witnesses abandon objectivity and become partisans, an injured plaintiff may be deprived of an award which he should rightly receive and a blameless defendant may suffer incalculable harm to his reputation and financial condition. I have also had occasion before to suggest that a critical discussion of this problem by the bar, professional schools and learned societies is long overdue. Such a discussion should aim at developing meaningful, ethical and professional standards by which the testimony of such witnesses may be governed.

In this case, the plaintiff called a witness who had the requisite academic degrees and other indicia of professional attainment to qualify as an economist. He was called upon to testify to the life expectancy of the plaintiff, a matter which hardly requires a degree in economics and, all other things being equal, can be ascertained by almost any literate person who can read a chart. What made his life expectancy testimony egregious, however, was that the standard tables had no relevance given a person with this plaintiff's ailments, the significance of which for a meaningful and credible opinion this witness was not qualified to translate. But even more disturbing was the readiness with which this *economist* testified that this plaintiff would be as well

served were a licensed practical nurse rather than a registered nurse to care for him sixteen hours per day. The September 19, 1988 transcript reads as follows (p. 22 lines 10–21).

Q. Was there any reason why you used a licensed practical nurse?

A. Because we felt that a registered nurse wasn't necessary for the kind of condition that he was in, but that he—he might need something a little bit more than a nurse's aide or just a home health care worker.

THE COURT: When you say "we felt," who is "we"?

THE WITNESS: Well, in discussing the issue with [plaintiff's attorney], I was actually pressing him as to what category of individual we ought to use. And we decided together that on the basis of the recommendations that were being made by the physicians, that a licensed practical nurse was sufficient, that a registered nurse wasn't necessary.

The following colloquy ensued upon cross examination:

Q. Doctor, when you first made your assessment in '85, that number of hours, excuse me, the level of care that was necessary for Mr. Glover, you chose the care of a licensed practical nurse, is that correct?

A. That's right.

Q. And at that point, that was not based on any physical assessment?

A. No.

Q. That was based upon your conversations with [plaintiff's lawyer]?

A. That is correct.

Q. Okay. And that's because you simply assumed that a practical—licensed practical nurse was the appropriate level of care?

A. I didn't assume anything. I did what I was told.

Cross examination also adduced the concession by this expert economist, that he couldn't recall any medical report indicating the need for a licensed practical nurse.

This economist's testimony regarding physical therapy borders upon the outrageous. He rendered an opinion that the plaintiff would need six hours of physical therapy per week which he then multiplied by the cost of a physical therapist as indicated in an occupational outlook handbook published by the government. At transcript page 39, lines 13–19, the following appears:

Q. Okay. To your recollection, do any of the reports indicate that six hours a week of physical therapy was necessary?

A. Well, as I testified before, there was a statement by a physician regarding the maintaining of physical therapy two or three times a week. Well, I just figured two or three times a week, a couple of hours a shot. That would be about six hours. So that's what I did. Six hours.

I should also add that I doubt whether an advanced degree in economics is necessary to read the charts in a government publication which would be admissible in evidence pursuant to Fed.R.Evid. 803(17) if a stipulation could not be reached as to a specific entry of the average wage of a particular occupation. For reasons which should be apparent, except for a recitation of hourly wages taken from the government publication, the witness' testimony has little to commend it.

The plaintiff called Dr. S., a neurologist, who examined Mr. Glover on one occasion and prepared a report. (Tr. of 9/22/88 at p. 139). Dr. S. impressed the court as a fine, conscientious man who candidly stated that he simply tested Mr. Glover's motor ability and found him to be a paraplegic. (Tr. 150). That simple fact notwithstanding, Dr. S was pressed to testify as to whether Mr. Glover needed rehabilitation therapy and in response to a question as to that on direct examination he forthrightly responded: ". . . I have no experience with rehab medicine, as I told you before." (Tr. 150). Dr. S. was also pressed to testify as to whether Mr. Glover required the care of a registered nurse or a licensed practical nurse and for how many hours per day. The following exchange is revealing:

Q. O'kay, I'd like to know from you whether he needs a licensed practical nurse or whether he needs some other kind of care?

THE COURT: Before you answer that question, Dr. ..., do you feel competent to render an opinion on that subject based upon your background and training?

THE WITNESS: Truthfully, no.

(Tr. 152).

The only contribution made by this witness is his corroboration of the fact that Mr. Glover was a paraplegic which was not contested.

Finally, the plaintiff called Dr. H., a nephrologist. He examined the plaintiff on three occasions, once in 1986 (Tr. of 10/21/88 at 94); once in 1987 (Tr. 96) and once in 1988 (Tr. 96). His testimony as to plaintiff's life expectancy was vacillating and vague (Tr. 107–10) and to the extent that he speculated that it might be as long as ten to twelve years, maybe a little more, (Tr. 108) his opinion is not credited. Dr. H. was pressed to opine regarding the necessity that the plaintiff be cared for by a registered nurse, a licensed practical nurse or a home aide (domestic) and, again this colloquy is revealing:

THE COURT: Dr. H, are you qualified to answer that question?

THE WITNESS: I don't know that I am.

(Tr. 113).

Dr. H. candidly admitted that the care and rehabilitation of paraplegics is not his specialty. (Tr. 122). As will be indicated in the discussion that follows, there was more than a little inquiry on Mr. Glover's capacity to perform sexually.[1] Dr. H. testified that he could state "with a reasonable degree of medical certainty" that Mr. Glover could have been sexually active in 1983 prior to his paraplegia and that he *thought* that his impotency thereafter was caused by that paraplegia. (Tr. 96–97) (emphasis added). Upon cross examination it became clear that he had no experience with the relationship between diabetes and impotence and that "The point was, *I was told* that the man wasn't impotent at a particular time and became impotent afterwards." (Tr. 129) (emphasis added). The court will give little, if any credence to the testimony of Dr. H.

Three lay persons testified on behalf of Mr. Glover. The lady with whom he lived from 1979–1983 was remarkably uninformed of the many ailments with which he was suffering during that period and her testimony regarding her ignorance that he was on a limited diet was in direct contradiction to Mr. Glover's testimony that he had so informed her. Cf. Tr. of 9/19/88 at p. 93 with Tr. of 10/20/88 at p. 75. Her testimony will be given little, if any, weight. The other two, were Mr. Glover's friends whose knowledge of his many physical infirmities was limited and who, although honest and credible gentlemen, contributed little to the resolution of the question before the court.

The witnesses who testified on behalf of the defendant impressed the court with their objectivity and with their careful review of the extensive medical records on which their assessments of Mr. Glover's physical condition and their opinions were based. Each recounted the chronology of his medical history as derived from the records. That history has been set out above. The testimony of those witnesses will be reviewed only insofar as it illuminated the issues of life expectancy; the need for home care; the extent, if any, to which the plaintiff's paraplegia exacerbated his pre-existing condition and such other considerations relevant to the question of damages which the court must resolve.

Dr. Arthur Rosen, a board certified neurologist and Professor of Neurology at the State University at Stonybrook stated that "... given his severe diabetes with vascular problems and his asthma and his hyper-

---

**1.** A lady with whom he lived from 1979–1983 testified that she had sex with him three or four times per night, seven nights per week. (Tr. 9/19/88 at p. 82). In *Matter of Findlay,* 253 N.Y. 1, 11, 170 N.E. 471 (1930) Judge Cardozo observed that "There are breaths of human nature at which presumptions shrink and wither." A suitable paraphrase of that incisive observation is surely appropriate.

tension, I would be very surprised, indeed, if he lived more than another five years." He went on to amplify his opinion by reference to Mr. Glover's chronic renal failure, which, he was certain, would escalate within the near future to end stage renal failure and that he would require dialysis which would not increase his life expectancy. (Tr. of 9/22/88 at 206.7). In fact, Mr. Glover was put on dialysis either immediately before or immediately after Dr. Rosen testified. (Tr. of 10/21/88 at p. 118).

Dr. Rosen's opinion regarding Mr. Glover's life expectancy was corroborated by Dr. Eric Hoffman, a board certified internist and clinical instructor at the State University of New York. He testified that Mr. Glover would live to age sixty. At the time of that testimony, Mr. Glover was fifty-five years of age so that his life expectancy would be five years and that estimate assumed that Mr. Glover would receive "good and adequate care." That opinion was, like Dr. Rosen's, predicated upon the effects of Mr. Glover's multiple medical problems acting in tandem, namely, his hypertension, diabetes and renal failure. (Tr. of 9/22/88 at 290–1). I accept the opinions of Drs. Rosen and Hoffman in this regard and find that Mr. Glover's life expectancy as of the date of the conceded malpractice, July 29, 1983, was ten years.

Turning to the question as to whether the malpractice exacerbated Mr. Glover's pre-existing conditions, the credible evidence drives me to conclude that there was no causal connection between them. Dr. Rosen was emphatic and unequivocal in stating that those factors were totally unrelated. (Tr. of 9/22/88 at 245). The medical records, as has already been discussed, make a claim of causal connection specious. Mr. Glover was suffering from diabetes, and hypertension, and asthma, and peripheral neuropathy and osteomyelitis for years prior to his paraplegia. He also had a history of renal insufficiency secondary to the onset of adult diabetes long before his paraplegia. (Tr. at 247).

Dr. Hoffman was equally as emphatic in stating the absence of any causal connection between the paraplegia and any exacerbation of hypertension, diabetes, vascular problems and renal failure. (Tr. 289–90).

As regards the need for home care, Dr. Rosen testified that if home care were to be provided at all, a home health aid would be capable of providing such care as Mr. Glover would need in two or three hours per day, seven days per week. (Tr. 192–3). Dr. Hoffman was of the same opinion (Tr. 291) and I would so find. It should be noted that when he was deposed, Mr. Glover's assessment of his need for home car coincided precisely with that of Drs. Rosen and Hoffman. It was only after a discussion with his attorney that Mr. Glover indicated a need for home care twenty-four hours per day. (Tr. of 10/20/88 at pp. 77–8). That testimony notwithstanding, the record reflects that Mr. Glover never manifested a need for home care and affirmatively rejected it. For example, he testified that in the summer of 1987 he received a retroactive disability payment in the sum of $142,990 and didn't use any portion of it to provide for home care. (Tr. of 10/20/88 at p. 69). The records of the Southside Hospital reflects that Mr. Glover refused home care (Tr. of 10/20/88 at pp. 33, 131–2). To award a sum for home care which the plaintiff has stated he doesn't want and for which, by his conduct, he has manifested no need, would be inappropriate.

To the extent that a claim is made that an award for damages should include a sum that would provide for rehabilitation therapy, the claim is denied. The record convincingly establishes that rehabilitation therapy is no longer required. See Tr. 9/22/88 at pp. 202–04; 291.

In *McDougold v. Garber*, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989), the New York Court of Appeals held that separate awards for loss of enjoyment of life and for pain and suffering are not required and would serve no useful purpose. Were a specific finding regarding Mr. Glover's ability to dance and to perform sexually prior to becoming a paraplegic to serve a useful purpose I would find that the credible evidence would indicate

that he was able to do neither. (Tr. 9/22/88 at 184–85).

The difficulty of translating the pain and suffering of another into a monetary equivalent is self-evident. The court described the problem succinctly and sensitively in *McDougold* as follows:

An economic loss can be compensated in kind by an economic gain; but recovery for noneconomic losses such as pain and suffering and loss of enjoyment of life rests on "the legal fiction that money damages can compensate for a victim's injury." ... We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong. We have no hope of evaluating what has been lost, but a monetary award may provide a measure of solace for the condition created. (citations omitted)

Based upon the findings of fact which have been set out in detail, the conclusion of law that necessarily follows is that the defendant is liable only for pain and suffering caused by the malpractice for which it accepts responsibility and which occurred on July 29, 1983. The defendant is not liable for the exacerbation, if any, of pre-existing conditions as claimed by the plaintiff for the reason that there was no causal connection between the malpractice and the claimed exacerbation.

■ After a careful consideration of all the surrounding facts and circumstances, and based upon a life expectancy of ten years from the date of the malpractice, an award of $650,000 is made to the plaintiff for his pain and suffering. The parties have agreed that discounting the award at a rate of 2% is appropriate in accordance with *Doca v. Marina Mercante Nicaraguense*, 634 F.2d 30, 40 (2d Cir.1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). The parties are directed to calculate the adjustment of the damages awarded to reflect present value in accordance with that rate.

Pre-judgment interest is precluded by 28 U.S.C. § 2674. In addition, payments which have been made to the plaintiff pursuant to 38 U.S.C. § 351 up to the date on which the judgment of this court is entered must be set off against the damages awarded.

SO ORDERED.